No. 13-1768

_____

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

_____

**KENDALL REID and BRADLEY SEARS,**
**Plaintiff-Appellants,**

**v.**

**NEIGHBORHOOD ASSISTANCE CORPORATION OF AMERICA,**
**Defendant-Appellee.**

_____

**Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
Cause No.  1:11-CV-8683
The Honorable Judge Amy J. St. Eve**

_____

**APPELLANTS' BRIEF**

_____

> Law Offices of Michael Lee Tinaglia, Ltd.
> Michael Lee Tinaglia ARDC No. 2835886
> Attorneys for Plaintiff-Appellants
> Kendall Reid and Bradley Sears

444 N. Northwest Highway, Suite 350
Park Ridge, Illinois 60068
Telephone:  (847) 692-0421
Facsimile:  (847) 685-8440
E-mail: mltinaglia@tinaglialaw.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No:   13-1768

Short Caption:   Kendall Reid and Bradley Sears, Plaintiff-Appellants v. Neighborhood Assistance Corporation of America, Defendant-Appellee

     To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

     The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[    ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

  (1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):  Kendall Reid and Bradley Sears

  (2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:  Law Offices of Michael Lee Tinaglia. Ltd and Curcio Law Office

  (3) If the party or amicus is a corporation:

      i)      Identify all its parent corporations, if any; and
            None

      ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock:
            None

Attorney's Signature: s/Michael Lee Tinaglia  Date: 7/31/2013
Attorney's Printed Name and E-Mail Address:Michael Lee Tinaglia; ltinaglia@tinaglialaw.com

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).
**Yes [x] No [  ]**
Address:           444 N. Northwest Highway, Suite 350, Park Ridge, Illinois 60068
 Phone Number:    (847) 692-0421
Fax Number:      (847) 685-8440

# TABLE OF CONTENTS

Circuit Rule 26.1 Disclosure Statement..........................................................ii

Table of Authorities ...............................................................................v

Jurisdictional Statement...........................................................................1

Statement of Issue .................................................................................3

**Did the district court err in granting Defendant-Appellee's motion for summary judgment by: erroneously concluding that Plaintiff-Appellants had failed to establish a genuine issue of material fact as to causation; failing to construe the evidence in favor of Plaintiff Appellants and failing to draw all reasonable inferences in favor of Plaintiffs-Appellants; ignoring relevant evidence in the record; and improperly adopted Defendants version of the facts?**

Statement of the Case ..............................................................................3

Statement of Facts................................................................................4

Summary of Argument  ........................................................................ 20

Argument ..........................................................................................22


A.     Standard of Review ......................................................................22

B.     The District Court Erred In Granting Defendant-Appellee's Motion
       For Summary Judgment By: Erroneously Concluding That Plaintiff-Appellants
       Had Failed To Establish A Genuine Issue Of Material Fact
       As To Causation; Failing To Construe The Evidence In Favor
       Of Plaintiff Appellants And Failing To Draw All Reasonable
       Inferences In Favor Of Plaintiffs-Appellants; Ignoring Relevant
       Evidence In The Record; And Improperly Adopted Defendants
       Version Of The Facts ....................................................................23


       1)  ...The District Court Erred In Failing To Draw The Reasonable Inference
       That Meadows, Cannonier And Pride And Not Marks Made The Decision
       To Terminate Plaintiffs ................................................................25


       2) The District Court Erred In Failing To Draw The Reasonable Inference
       That NACA's Alleged Reasons For Terminating Reid Were Limited To
       Alleged Attendance Issues And A Violation Of The NACA Document

**Security Policy** .................................................................**27**

   **3) The District Court Erred In Failing To Draw The Reasonable Inference That NACA's Alleged Reason For Terminating Sears Was Limited To An Alleged Violation Of The NACA Document Security Policy** ..........................**27**

   **4) The Close Timing Of The Terminations In Relation To Plaintiffs' Complaints Supports An Inference That The Complaints Caused The Terminations And The District Court's Conclusion To The Contrary Was Error** ...................................................................................**33**

   **5) The "Moving Target" Defense Of NACA During The Pendency Of The Case In And Of Itself Created A Genuine Issue Of Fact On The Question Of Retaliatory Motivation** ...................................................**35**

**Conclusion** ..........................................................................................**39**

**Certificate of Compliance with Fed. R. App. P. 32(a)(7)** .................**40**

**Certificate of Compliance with Circuit Rule 30(d)** .........................**41**

**Proof of Service** ...................................................................................**42**

**Short Appendix**

**Memorandum Opinion and Order of March 14, 2012** .......................**A1-A24**

**Exhibit 29 to Meadows Deposition** ...................................................**A25-A28**

iv

# TABLE OF AUTHORITIES

## <u>CASES</u>

### JURISDICTIONAL STATEMENT

*Baradulina v. Seven Colors,* No. 10 C 5802, 2010
U.S. Dist. LEXIS 107276, at 3 (N.D. Ill. Oct. 7, 2010). …………….............................2

*See Brandt v. Brotherhood's Relief and Compensation Fund,* 07 C 2204, 2007
U.S. Dist. LEXIS 53783……………………………………….…………………………..2

*Carroll v. Stryker Corp.,* 658 F.3d 675, 681 (7th Cir. 2011.)…………………………..1

*Davis v. Carter, et al.,* 61 Fed. Appx. 277, 278 (7th Cir. 2003)...………………………1

*Hoidas v. Wal-Mart Stores, Inc.,* No. 09 C 7409, 2010
U.S. Dist. LEXIS 43558, at *7-8 (N.D. Ill. April 30, 2010) …………..…………..……2

*Paddack v. Life Ins. Co. of N. Am.,* 4:09-CV-25, 2009
U.S. Dist. LEXIS 75032, at * 17 (N.D. Ind. Aug. 24, 2009)…………………….……..1

### APPELLANTS' ARGUMENT

**A.      Standard of Review**

*Abdullahi v. City of Madison,* 423 F. 3d 763, 773 (7th Cir. 2005) )…..……….……...22

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255,
106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). )…..…………………………………..….…23

*Arizanovski v. Wal-Mart Stores, Inc.* 682 F.3d 698, 702 (7th Cir. 2012) )…..………...23

*Valenti v. Qualex, Inc.,* 970 F.2d 363, 365 (7th Cir. 1992) )…………..………..…..…22

**B.      The District Court Erred In Granting Defendant-Appellee's Motion For Summary Judgment By: Erroneously Concluding That Plaintiff-Appellants Had Failed To Establish A Genuine Issue Of Material Fact As To Causation; Failing To Construe The Evidence In Favor Of Plaintiff Appellants And Failing To Draw All Reasonable Inferences In Favor Of Plaintiffs-Appellants; Ignoring Relevant Evidence In The Record; And Improperly Adopted Defendants Version Of The Facts.**

*Abdullahi v. City of Madison*, 423 F. 3d 763, 773 (7th Cir. 2005) )…..……….……….24

*Burgess v. Chicago Sun-Times*, 132 Ill. App. 3d 181, 476 N.E.2d 1284, 1287,
 87 Ill. Dec. 292 (1st Dist. 1985) ..……………………………………………...…25

*Dotson v. BRP US, Inc*., 520 F.3d 703, 707 (7th Cir. 2008) ..…………………………24

*Hartlein v. Illinois Power Co*., 151 Ill. 2d 142,
601 N.E.2d 720, 728, 176 Ill. Dec. 22..…………..………………………………………24

*Mackie v. Vaughan Chapter-Paralyzed Veterans of Am., Inc.*,
354 Ill. App. 3d 731, 739-40, 820 N.E.2d 1042, 1049 (1st Dist. 2004)....…………….23

*Russ v. Pension Consultants Co., Inc.,* 182 Ill. App. 3d 769,
538 N.E.2d 693 (1st Dist. 1989) )…..………………………………….….………..23

> **1)  The District Court Erred In Failing To Draw The Reasonable Inference That Meadows, Cannonier And Pride And Not Marks Made The Decision To Terminate Plaintiffs.**

*Abdullahi v. City of Madison*, 423 F. 3d 763, 773 (7th Cir. 2005) )…..……….……….25

*Goode v. Am. Airlines, Inc.,* 741 F. Supp. 2d 877, 891 (N.D. Ill. 2010)………………..27

*Mangual v. Prudential Lines Co,* 53 F.R.D. 301, 1971 U.S. Dist. LEXIS 11587
(E.D. Penn 1971) )…..…………………………………………………………….………26

*Murrey v USA,* 73 F3d, 1448 (7th Cir. 1996………………………………….………26

> **2)  The District Court Erred In Failing To Draw The Reasonable Inference That NACA's Alleged Reasons For Terminating Reid Were Limited To Alleged Attendance Issues And A Violation Of The NACA Document Security Policy.**

> **3)  The District Court Erred In Failing To Draw The Reasonable Inference That NACA's Alleged Reason For Terminating Sears Was Limited To An Alleged Violation Of The NACA Document Security Policy.**

*King v. Preferred Technical Group*, 166 F.3d 887, 894 (7th Cir. 1999)…….….……..32

> **4)  The Close Timing Of The Terminations In Relation To Plaintiffs' Complaints Supports An Inference That The Complaints Caused The Terminations And The District Court's Conclusion To The Contrary Was Error.**

*Casna v. Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) ………………..………..33

*Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)……………………………………………………………..33

*Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312 (7th Cir. 2011)…… ………..……..33

*McClendon v. Indiana Sugars, Inc*., 108 F.3d 789, 796-97 (7th Cir. 1997)………..…33

*Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004)…………………………………...33

**5) The "Moving Target" Defense Of NACA During The Pendency Of The Case In And Of Itself Created A Genuine Issue Of Fact On The Question Of Retaliatory Motivation.**

*County of Schuyler v. Missouri Bridge & Iron Co*., 256 Ill. 348, 353, 100 N.E. 239 (1912)……………………………………………………………...38

*Coulter v. American Employers' Insurance Co*., 333 Ill. App. 631, 78 N.E.2d 131 (1948)…………………………………………………………..38

*Gibson v. Brown*, 214 Ill. 330, 341, 73 N.E.578 (1905)………………………………38

*Hitchcock v Angel Corps, Inc.* No. 12-3515, 2013, U.S. App. LEXIS 11761 (7th Cir. 2013)…………………………………………………...…35

*Townsend v. Postal Benefit Ass'n of Illinois*, 262 Ill. App. 483, 489 (1931)…………..38

*Trossman v. Philipsborn*, 2006 Ill. App. LEXIS 738, No. 1-04-0588 (August 21,2006)…………………………………………………………………38

# JURISDICTIONAL STATEMENT

A.     <u>DISTRICT COURT JURISDICTION</u>.  The jurisdiction of the District Court

was based upon diversity of citizenship pursuant to 28 U.S.C. § 1332, there being complete

diversity between both Plaintiffs and the Defendant.  On or about November 2, 2011,

Plaintiffs-Appellants, Kendall Reid and Bradley Sears filed a lawsuit against Defendant-

Appellee, Neighborhood Assistance Corporation of America ("NACA") in the Circuit Court

for Cook County, Illinois, entitled *Kendall Reid and Bradley Sears v. Neighborhood*

*Assistance Corporation of America,* No. 11 L 11397.  In accordance with 28 U.S.C. §§ 1441

and 1446, Defendant-Appellee, NACA filed a Notice of Removal within thirty (30) days of it

being serviced with Summons and Complaint.  Both Kendall Reid and Bradley Sears reside

and are domiciled in Illinois and are therefore citizens of the State of Illinois.  (Doc. No. 1 and

*Davis v. Carter, et al.,* 61 Fed. Appx. 277, 278 (7th Cir. 2003)). Defendant-Appellee, NACA

is a citizen of Massachusetts, it being a corporation organized under the laws of the State of

Massachusetts and whose principal place of business is in Massachusetts. (Doc No. 1, Compl.

¶7 and 28 U.S.C. § 1332(c)(1)). The amount in controversy in this case exceeds $75,000. In

their complaint each Plaintiff sought an amount "in excess of $50,000" and damages without

limitation for "lost income, benefits, emotional distress and damage to [their] reputation."

(Doc. No. 1; Compl. ¶¶42,54.)  The foregoing damages push the amount in controversy over

$75,000. *See Carroll v. Stryker Corp.,* 658 F.3d 675, 681 (7th Cir. 2011) (including wages and

benefits toward the $75,000 amount in controversy threshold for diversity jurisdiction); *see*

*also, e.g., Paddack v. Life Ins. Co. of N. Am.,* 4:09-CV-25, 2009 U.S. Dist. LEXIS 75032, at *

17 (N.D. Ind. Aug. 24, 2009) (including damages for financial losses and emotional distress

toward the $75,000 amount in controversy requirement); *see also Hoidas v. Wal-Mart Stores, Inc.,* No. 09 C 7409, 2010 U.S. Dist. LEXIS 43558, at *7-8 (N.D. Ill. April 30, 2010) (amount in controversy satisfied where plaintiff alleged that she sought more than $50,000, and alleged damages for medical expenses and pain and suffering).  Plaintiffs also seek punitive damages and attorney's fees. Punitive damages can satisfy the minimum amount in controversy required for diversity jurisdiction if they are recoverable under state law. (*Baradulina v. Seven Colors,* No. 10 C 5802, 2010 U.S. Dist. LEXIS 107276, at 3 (N.D. Ill. Oct. 7, 2010)). Similarly, attorney's fees will count towards the amount in controversy requirement "exclusive of interests and costs." (*See Brandt v. Brotherhood's Relief and Compensation Fund,* 07 C 2204, 2007, U.S. Dist. LEXIS 53783, at 5.)

      B.    <u>APPELLATE JURISDICTION.</u>  The United States Court of Appeals for the Seventh Circuit has jurisdiction pursuant 28 U.S.C. § 1291 which allows appeal after entry of a final judgment or order.  On March 14, 2013 a Memorandum Opinion and Order (Doc. No. 71) granted summary judgment to Defendant and against Plaintiffs.  On March 14, 2013, a Final Judgment (Doc. No. 72) entered in favor of Neighborhood Assistance Corporation of America and against Kendall Reid and Bradley Sears.  The Plaintiffs, Kendall Reid and Bradley Sears filed a timely Notice of Appeal (Doc. No. 73) on April 11, 2013 in the U.S. District Court for the Northern District of Illinois.

**STATEMENT OF THE ISSUE PRESENTED FOR REVIEW**

Did the district court error in granting Defendant-Appellee's motion for summary judgment by: erroneously concluding that Plaintiff-Appellants had failed to establish a genuine issue of material fact as to causation; failing to construe the evidence in favor of Plaintiff-Appellants and failing to draw all reasonable inferences in favor of Plaintiffs-Appellants; ignoring relevant evidence in the record; and improperly adopting Defendants version of the facts?

**STATEMENT OF THE CASE**

Kendall Reid and Bradley Sears claims consist of common law and statutory retaliatory discharge causes of action against Neighborhood Assistance Corporation of America ("NACA").   On or about November 2, 2011, Plaintiffs-Appellants filed an action against Defendant-Appellee, in the Circuit Court for Cook County, Illinois, entitled *Kendall Reid and Bradley Sears v. Neighborhood Assistance Corporation of America,* No. 11 L 11397.  On December 7, 2011, Defendant-Appellee filed a Notice of Removal. (Doc. No. 1) On December 20, 2011, NACA filed its Answer and Affirmative Defenses.  (Doc. No. 9)

On April 17, 2012 the Court entered an agreed protective order.  (Doc. No. 25)  On September 19, 2012, Plaintiff-Appellants' filed a motion to compel testimony and production of information withheld on the basis of privilege (Doc. No. 39). On that same day Plaintiff-Appellants' filed a motion to file exhibits to motion to compel under seal pursuant to the protective order.  (Doc. No. 40)  The Motion to Compel was denied and the Motion to file under seal was granted.  (Doc. Nos. 42, 60)  On September 21, 2012, Defendant-Appellee filed its motion for summary judgment and supporting materials. (Doc. Nos. 44, 45 and 46)

On November 19, 2012, Plaintiff-Appellants filed their Response in Opposition to summary judgment and supporting materials.  (Doc. Nos. 57-58)

On March 14, 2013 the district court entered a Memorandum Opinion and Order granting summary judgment to NACA and against Reid and Sears.  (Doc. No. 71)  On March 14, 2013, a final judgment was entered.  (Doc. No. 72) Reid and Sears filed a timely Notice of Appeal on April 11, 2013 (Doc. No. 73).

## APPELLANTS' STATEMENT OF FACTS

The statement of facts set forth in the "Relevant Facts" section of the district court's Memorandum Opinion and Order does not contain all the relevant facts. (See Appendix pgs. 2-5.) However, Plaintiffs do not contest the facts that are set forth in the "Relevant Facts" section and those facts are adopted by Reid and Sears.  Those facts - with docket references added - are as follows:

Plaintiffs Reid and Sears were "at-will" employees of NACA.  (Doc. 46, Def.'s 56.1 Statements ¶20) ("Doc. 46, Def.'s 56.1").  NACA is a not-for-profit corporation that "counsel[s] potential homeowners ...to assist them in purchasing a home." (Doc. 46, Def.'s 56.1 ¶2)  These potential homeowners are also known as "members." (*Id.*) NACA's objectives are to "combat…discriminatory and predatory lending practices" and to make home ownership a realistic possibility for thousands of people who had thought it impossible."  (Doc. 46, Def.'s 56.1 ¶3)  NACA hired Reid and Sears as mortgage consultants in NACA's Chicago Office in October 2007 and May 2010, respectively. (*Id.* at ¶¶15,16) NACA's Chicago Office "consisted of an office manager, several mortgage consultants, and two administrative assistants." (*Id.* ¶18)  From early 2010 until the time of their terminations, Plaintiffs reported to Norma Martinez, the office manager of the Chicago Office. (*Id.* ¶18)

4

Martinez reported to Donald Meadows, NACA's Regional Operations Director for the region that included NACA's Chicago Office during 2010. (Doc. 46, Def.'s 56.1 ¶19) Meadows was physically based in Baton Rouge, Louisiana. (*Id.*)

In April 2010, Norma Martinez placed posters on the walls of the Chicago Office "indicat[ing] that the Illinois minimum wage was increasing to $8.25." (Pls.' 56.1 Statement of Additional Facts ¶17) ("Doc. 57, Pl.'s 56.1 SOF") On or after July 1, 2010, at a Chicago Office staff meeting, Reid asked Don Meadows whether NACA would pay the increased minimum wage. (Doc. 57, Pls.' 56.1 SOF ¶18) After July 1, 2010, Reid testified that he complained to NACA management or employees several times about the minimum wage increase. (*Id* ¶18) Specifically, Reid contends that he complained to Don Meadows that "[NACA] did not make the adjustments on our hourly wage." (*Id.* ¶9) Sears made similar complaints to Meadows and Martinez. (*Id.* ¶¶27-28)

Reid also complained about mortgage consultants not receiving proper overtime pay. Following the "big Chicago HomeSave" tour sometime after July 2010, Reid "raised the issue of the wages and overtime not being right for tours with Norma [Martinez] and in one conversation with Don Meadows." (*Id* ¶21) Specifically, Reid complained that "he and other mortgage consultants worked 13 hour days but were not paid for working 13 hours a day." (*Id.*)

Finally, Reid complained about NACA's practices regarding the processing and splitting of compensation for mortgage applications. As part of his work as a mortgage consultant, Reid signed Form 1003 Applications ("Form 1003"). (*Id* ¶22.) According to Plaintiffs, on a Form 1003, a mortgage consultant at NACA represents that he or she "interviewed the client applying for the mortgage," "gathered the appropriate information

to close the file," and "did not rely on the information of others." (*Id.*) During the time when NACA was implementing federal Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE Act") regulations, Reid and Meadows were the only two employees licensed in Illinois to sign Form 1003s. (*Id.* ¶¶13, 22) Reid averred that Meadows signed off on loan applications and documents completed by other non-licensed mortgage consultants. (*Id.* ¶13) According to Reid, he came to believe this practice was illegal in February or March of 2010 after speaking with Hazel McLamore, a U.S Department of Housing and Urban Affairs ("HUD") representative who was auditing NACA's files. (*Id.* ¶23) Ms. McLamore "confirmed that NACA practices of having licensed mortgage consultants signing off on loan files worked on by unlicensed mortgage consultants was illegal." (*Id.*) Reid complained that this practice was illegal to Norma Martinez and Don Meadows. (*Id.* ¶24) Reid also complained about NACA's practice of splitting commissions between licensed and unlicensed consultants to Don Meadows and at a staff meeting. (*Id.* ¶25) Reid testified that he first complained about signing documents and splitting commissions around March, April, or May of 2010, and that he made his last complaint on this subject around late September of 2010. Sears made similar complaints to NACA management regarding NACA's practices pertaining to compensation splitting and requiring "mortgage consultants to affix their names to Form 1003 Applications." (*Id.* ¶29-32)

On Friday, October 8, 2010, Reid left the NACA office at 6:30 p.m. to attend a Chicago Bulls basketball game. (*Id.* ¶20; Doc. 57, Pls.' 56.1 Resp. ¶21) According to Reid, Norma Martinez gave Reid permission to do so. (Doc. 57, Pls.' 56.1 SOF ¶2) On the morning of October 9, 2010, Martinez told Reid at the Chicago Office that "he was being suspended until further notice." (Doc. 46, Def.'s 56.1 ¶22) Plaintiffs contend that Martinez

6

told Reid that "even though he worked the ten hour day on Friday[,] it was unfair for him to leave early when everyone else had to stay to 8:00 pm." (Doc. 57, Pls.' 56.1 Resp. ¶22)

On October 11, 2010, Rachelle Pride, NACA's National Real Estate Director, visited the Chicago Office.  (Doc. 46, Def.'s 56.1¶23)  On that day, the only Chicago employees present in the office were Sears, Martinez, and Mariola Jasinska, another mortgage consultant.  (Def.'s 56.1 ¶25)  At her deposition, Pride testified that on October 11, she informed NACA's CEO, Bruce Marks, that on her visit she saw practices that "w[ere] out of NACA policy," including "financial and sensitive documents for the NACA members that were visible ...on top of desks in different places" and "alcoholic beverages in one of the offices."  (Doc. 46, Def.'s 56.1 ¶27; Pride Dep. 24:22, 28:11, 25:20.)  Pride testified that she asked Marks for a directive, and he instructed her "to ask the two mortgage consultants for their office keys and to ask them to leave the office." (Pride Dep. 28:19-24.)  Pride then explained to Sears that he "had the documents" everywhere and that she "had been given a directive to ask him for his key and to ask him to leave the premises."  (Pride Dep. 32:17-24.)  On October 14, 2010, NACA decided to terminate both Sears and Reid.  (Def.'s 56.1 ¶¶45-46.)

 On November 2, 2011, Plaintiffs filed suit in the Circuit Court of Cook County Illinois, alleging common law and statutory Illinois retaliatory discharge claims.  (R.l, Compl.) Plaintiffs alleged that NACA terminated them in retaliation for their complaints about NACA's alleged failure to pay minimum wage and overtime in violation of the Illinois Minimum Wage Law ("IMWL") and Illinois Wage Payment and Collection Act ("IWPCA"), as well as complaints about practices regarding compensation-splitting and signing mortgage applications allegedly prohibited by the Illinois Residential Mortgage

7

License Act ("IRMLA") and the SAFE Act. On December 7, 2011, Defendant removed this case to federal court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (R. 1, Not. Removal.) Defendant moved for summary judgment on September 21, 2012. (R. 44.) (Appendix pgs. 2-5)

Plaintiffs also include the following facts as relevant to this Court's appellate review.

## COMPLAINTS REGARDING MINIMUM WAGE AND OVERTIME

Between April and June of 2010, Reid had multiple conversations with his immediate supervisor, Martinez, regarding whether NACA was going to pay Reid and other NACA employees the proper new hourly rate after July 1, 2010. (Doc. 57, Pls.' 56.1 SOF ¶17; Reid Dep. at 66, line 22). Reid testified that after July 1, 2010 the effective date of the increase in minimum wage he complained to Regional Operations Director, Don Meadows at a HomeSave event at McCormick Place about the minimum wage increase and Meadows 8 responded that Bruce Marks "is not going to do it." (Doc. 57, Pls.' 56.1 SOF ¶18; Reid Dep. at 69-70). Reid also sent Meadows, Martinez, Stella Marquez, Debbie Prussman, Detria Austin and Christine Cannonier emails regarding NACA paying employees the increase in minimum wage. (*Id.*)

During a national conference call which occurred prior to July 1, 2010, and which Bruce Marks participated, someone asked the question if they would be getting an increase in minimum wage and Marks went off yelling and screaming saying:

> "We will pay you what we have to pay, and he basically said NACA is the only game in town. If you don't like it, this is not about the – this is not about your money. This is about the time that you give, and if you don't like it, there's the door." (Doc. 57, Pls.' 56.1 SOF ¶20; Reid Dep. at 73-74).

In July 2010, Reid complained to Martinez and Meadows that he and the other mortgage consultants were not receiving proper wages and overtime.  (Doc. 57, Pls.' 56.1 SOF ¶21, Reid Dep. at 93-99)

On several occasions after July 1, 2010 Bradley Sears complained to supervisor, Martinez and Regional Operations Director, Meadows that he and other employees of NACA were not receiving the appropriate minimum wage and appropriate pay. (Doc. 57, Pls.' 56.1 SOF ¶27-28, Sears Dep. 34, 69-70, 77-80).

### COMPLAINTS REGARDING NACA VIOLATIONS
### OF STATE AND FEDERAL LAW AND COMPENSATION SPLITTING

When signing Form 1003 Applications, a mortgage consultant makes certain representations including the representation that he/she interviewed the client applying for the mortgage; he/she gathered the appropriate information to close the file and that he/she did not rely on the information of others.  (Doc. 57, Pls.' 56.1 SOF ¶¶22, 29, Sears Dep. 90-91, 9 lines 13-16; Meadows Dep. at 47, lines 14-23).   After the passage of the Secure and Fair Enforcement For Mortgage Licensing act ("SAFE Act") loan originators also known as mortgage consultants were required to have a license to take and complete loan applications. The Safe Act presented a problem for NACA because the majority of mortgage consultants/loan originators at NACA did not obtain a license or had tried and failed the testing in Illinois and other states. (*Id.;* Reid Declaration ¶¶16-17)  Without a loan originators license, the mortgage consultants at NACA would not be able to take loan applications, process loan applications or close loans.  This meant the person would not be able to generate revenue for NACA. At the time Reid was terminated he held a loan originator license in Indiana, Wisconsin and Illinois. When NACA implemented the requirements of the Safe Act, Don Meadows and Kendall Reid were the only two people

9

licensed in Illinois. Even after Don Meadows was promoted to Regional Director, he and Reid were signing off on most of the loan applications for client/members at the Chicago office even though neither one worked on the particular loan files they were signing off on. Unlicensed mortgage consultants were doing the loan applications which they were not legally allowed to do and these applications were signed by Reid or Meadows. (Doc. 57, Pls.' 56.1 SOF ¶13; Reid Declaration ¶¶18-22)

On several occasions Reid and Sears complained to NACA management about NACA's practices of:

a) Requiring licensed mortgage consultants to split their compensation on mortgage loan files with unlicensed mortgage consultants;

b) Requiring licensed mortgage consultants to split their compensation on mortgage loan files with NACA;

c) Requiring licensed mortgage consultants to split their compensation on mortgage loan files with another mortgage consultant that did not work on the file; and

d) Requiring licensed mortgage consultants to sign off on HUD 1003 and other application and loan documents when the work was performed by an unlicensed employee or when the work was performed by another licensed mortgage consultant.

(Doc. 57, Pls.' 56.1 SOF ¶12; Reid Declaration ¶15; and Sears Declaration ¶24)

After Reid spoke with McLamore he also spoke with someone at the State of Illinois who confirmed the illegality of the NACA practices.  Once Reid realized and confirmed that the NACA practices were unlawful he notified NACA management.  Reid had several conversations and meetings with Don Meadows and Norma Martinez.  Don Meadows told Reid there was nothing NACA could do because we had to take the loan applications, process the loan applications and close the loans. (Doc. 57, Pls.' 56.1 SOF ¶¶14, 23, 24, 25; Reid Declaration ¶¶23-25; Reid Dep. at 105-109, 110-112, 113-116, 128-130, 135).

Regional Director Detra Austin, Cannonier and Marks all knew of Reid's complaints; they all participated in a national conference call when Reid complained about having to affix his signature on Form 1003 Applications.  (Doc. 57, Pls.' 56.1 SOF ¶23, Reid Dep. at 108, lines 9-19).

Plaintiffs' complaints presented Don Meadows with several problems:

a.  Reid and Sears as complainers were under Don Meadow's jurisdiction and that made him look "bad;"

b.  The more Plaintiffs complained the higher the profile of the illegal activities NACA was engaging in the purpose of obtaining and close mortgage loan;

c.  Don Meadows had significant personal exposure as a result of him personally violating the federal and state law;

d.  Don Meadows also had significant personal exposure because the illegal activities of others were under his supervision and with his knowledge.

Meadows had an interest in getting Bradley Sears and Kendall Reid terminated from NACA. The termination of Sears and Reid would silence their complaints and lessen Don Meadows risk and exposure arising from the federal and state law violations.  (Doc. 57, Pls.' 56.1 SOF ¶15; Reid Declaration ¶¶26-28)  Meadows admits that he spoke with both Rachell Pride, NACA National Real Estate Director and Christine Cannonier, NACA National Human Resource Director, in a conference call prior to the terminations.  (Doc. 57, Pls.' 56.1 SOF ¶15; Meadows Dep. at 86-88)

Reid testified that when he complained to Martinez he specifically said:

"Norma, why am I splitting my commissions? No. 1 it is illegal.  I don't feel comfortable.  I never felt comfortable…signing off on all these mortgages that were getting done in Milwaukee that I never even met these people."

Reid told Martinez that it was not just the Form 1003 document, it was every document. It was the good faith estimate document, the truth-in-lending, the 30-40 documents required by

the Safe Act. Reid testified he told Martinez he felt like he was committing fraud and NACA was putting him "in a bad, bad situation." Reid was very uncomfortable about what would happen if the State came after him.  (Doc. 57, Pls.' 56.1 SOF ¶24, Reid Dep. 110-112)  In a conversation with Don Meadows sometime around April/May of 2010, Reid told Meadows the splitting of commissions between licensed and non-licensed people was unfair and illegal. Again, Meadows responded that there was nothing NACA could do because the loans had to be closed.  (Doc. 57, Pls.' 56.1 SOF ¶25, Reid Dep. 106-107, 113-115, 135, lines 2-16)  The last time Reid made the complaints regarding signing documents and splitting commissions was late September 2010, ten days before he was terminated. (Doc. 57, Pls.' 56.1 SOF ¶26, Reid Dep. 245)

On several occasions in 2010 Sears complained to the management of NACA both orally and in electronic written form that by requiring him and other mortgage consultants to affix their names to the Form 1003 Applications and splitting compensation from loan transactions with other employees, it was violating state and federal law.  (Doc. 57, Pls.' 56.1 SOF ¶¶29-31, Sears Dep. 92-96, 102, ).  Sears complained to Norma Martinez, Don Meadows, Detra Austin and Christine Cannonier.  Sears estimated that he complained approximately eight to ten times about the HUD Form 1003 issue and splitting compensation. (*Id.;* Sears Dep. 95, 105).

Sears told NACA management that it was illegal and a violation of the licensing requirements to have one person sign the HUD 1003 and have another person gather the information, submit the information and then split the compensation between the two people. Sears told management that NACA practices violated the SAFE Act, State of Illinois licensing laws and the NMLS regulations.  (*Id.;* Sears Dep. 102-104, lines 13-20).

12

On October 11, 2010, literally a few days before Sears was terminated, he complained in writing via email and NACA's sparks communication network to Don Meadows, Stella Marquez-Murray and Detria Austin about the NACA illegal practice of splitting commissions on mortgage loan transactions in which he was involved.  A copy of the email/sparks communications with Meadows, Murray and Austin was identified as Exhibit 29 at the Meadows Deposition.  The October 11, 2012 complaints were the last complaints prior to Brad Sears termination on October 14, 2010.  (Doc. 57, Pls.' 56.1 SOF ¶32, Sears Declaration, paragraphs 25-27and Appendix 28-33)

Diana Lazu corroborated the testimony of Reid and Sears concerning the NACA practice of split compensation.  She also confirmed that Reid, Sears and Andrell Thomas complained about signing the HUD Form 1003 "because it put them on the hook if there was any fraud."  Lazu testified that she overheard Reid and Sears complaining to Don Meadows and Detria Austin on several occasions about the "pay" and splitting of the "pay." (Doc. 57, Pls.' 56.1 SOF ¶33-34, Lazu Dep. 40-41, 43, 55-56,  59, 60, 69-70)

## PAPERLESS CONFIDENTIALITY POLICY NOT ENFORCED OR DISSEMINATED

It is undisputed that NACA had a policy entitled, NACA Office Document Security Policy ("Document Security Policy").  However, a dispute exists as to whether NACA enforced the Document Security Policy, whether the policy was disseminated to employees and whether a violation of the policy was a basis for termination of an employee.

Former NACA employee, Diana Lazu testified that she did not know that she could not have paperwork at her desk.  She was never told she could not have member paperwork on her desk or in the work area.  Lazu also testified that she never received any correspondence from NACA Human Resources or NACA management related to

13

maintaining client confidentiality of documents. She testified there was never a meeting concerning document confidentiality and no one from NACA ever came to the Chicago office to "discuss what the proper procedures were to do with member documents." (Doc. 57, Pls.' 56.1 Resp. ¶5; Lazu Dep. 105-107)  Lazu stated that the first time she was told that member's information should never be exposed in the work area was <u>after</u> Rachelle Pride's October 2010 visit to the Chicago office which was after Plaintiffs' Reid and Sears were terminated. Lazu also testified that the first time she was told that an employee was subject to immediate termination for violating the Document Security Policy was after the termination of Plaintiffs Reid and Sears.  (*Id.*)

Former NACA employee, Andrell Thomas testified that the Document Security Policy was never enforced.  The office manager never said anything about the policy.  In fact, the office manager left documents on her desk. (Doc. 57, Pls.' 56.1 Resp. ¶5; Thomas Dep. 117-119)

Even though Don Meadows, Regional Operations Director, James Kimmons, Regional Director and Detria Austin, Regional Director, regularly visited the Chicago office they never held any meetings or discussed the Document Security Policy with the Chicago staff.  Similarly, Meadows, Austin and Kimmons never told Chicago staff that the Document Security Policy was being violated.  (Doc. 57, Pls.' 56.1 Resp. ¶5, Thomas Dep. 132-133; Sears Dep. 143, 145-146; Reid Dep. 218-219)

**PAPERLESS POLICY VIOLATION NOT GROUNDS FOR TERMINATION**

After Rachelle Pride visited the NACA Chicago officer, she prepared a report (Pride Report"), identified as Cannonier Dep. Exhibit 1 at the Cannonier deposition.  In that report Pride concluded that of the nine mortgage consultants at the Chicago NACA office only one

14

employee was in compliance with the NACA "paperless policy." Yet only the Plaintiffs and

one other employee were terminated. (Doc. 57, Pls.' 56.1 Resp. ¶11, Cannonier Dep. 68-71

and Cannonier Dep. Exhibit 1)  CEO Bruce Marks conceded in his deposition that violation

of the Document Security Policy would not be a basis for the termination of Reid or Sears.

(Doc. 57, Pls.' 56.1 SOF ¶¶45, 46, Marks Dep. 92)

## BULLS GAME

During the weekend of October 9, 2010, the NACA Chicago office was acting as a

"back-up" call center to field calls and help relieve another NACA office that was working a

"tour"  Reid testified that one week prior to the October 8, 2010 Chicago Bulls game, in front

of at least six other employees in the break room, he told his supervisor Norma Martinez that

he had tickets to the game and stated that if she gave him permission to go to the game he

would work a 10 hour day on October 8, 2010 and also work the entire week-end.  Martinez

gave her permission stating that it was fine as long as Reid was going to work the week-end.

Before Reid left for the game on October 8, 2010, Reid approached Martinez to let her know

he was leaving and Martinez said, "No problem, see you tomorrow morning." Martinez never

objected to Reid going to the game and never told Reid that he should not go to the game.

Diana Lazu corroborated Reid's testimony. (Doc. 57, Pls.' 56.1 Resp. ¶21, Reid Dep. 146,

148-149, 173, 177, Lazu Dep. 110-112)

## SEARS TELEPHONE CONFERENCE WITH MEADOWS

A few days after October 11, 2010, Sears went to the NACA Chicago office to

participate in a pre-arranged telephone conference call with Don Meadows to discuss four

loan files. For purposes of the telephone call with Don Meadows Sears printed out the

paperwork on the four loan files to be discussed during the scheduled call.  There were no

other paper files in his office.  After Sears printed out the four files paperwork he tried to make contact with Don Meadows, left him a message and awaited his return call.  In fact, he made more than one attempt to contact Meadows that day but Meadows never returned Sears calls even though the telephone call was pre-arranged between Meadows and Sears.  Rachelle Pride came into Sear's office while he was waiting for Don Meadows to return Sears calls and she stated: "I see you have client files on your desk, you are terminated." (Doc. 57, Pls.' 56.1 SOF ¶¶45, Declaration of Sears ¶¶5-8)

### TERMINATION OF REID AND SEARS

Bruce Marks testified that it was his sole decision to terminate Reid and Sears. (Doc. 46, Def.'s 56.1 ¶51)  However, the evidence in the record is controverted as to whether Marks was involved in the termination of Plaintiffs Reid and Sears and whether Marks made the decision to terminate the Plaintiffs.

First, Sears testified that Pride fired him on the spot in the Chicago office on Monday, October 11, 2010 stating: "I see you have client files on your desk. You're terminated." (Doc. 57, Pls.' 56.1 Resp. ¶¶29, 31, Sears Dep 186-187).  Second, Cannonier testified that the decision to terminate Reid and Sears was made during a conference call and that the decision was a group decision and not the decision of any one individual.  Third, Diana Lazu testified that Norma Martinez told her that Martinez fired Reid.  Fourth Reid testified that Don Meadows and Norma Martinez terminated him.  (Doc. 57, Pls.' 56.1 Resp. ¶33, Cannonier Dep. 50, Lazu Dep. 96, Reid Dep. 235-236).

Bruce Marks was not identified as a person having knowledge or information relating to Plaintiffs allegations in the Complaint or Defendant's defenses to the Complaint in Defendant's Rule 26(a)(1) disclosures.  On February 17, 2012, NACA responded to Plaintiffs

First Set of Interrogatories ("2-17-12 Interrogatory Answers").  Bruce Marks was not identified in the 2-17-12 Interrogatory Answers as among the individuals that have knowledge or information of facts relating to Plaintiff's allegations in the Complaint or Defendant's defenses thereto.  (Doc. 57, Pls.' 56.1 Resp. ¶33)

In its answers to Interrogatories 11 and 13 of the 2-17-12 Interrogatory Answers, NACA affirmatively states that Don Meadows, Rachelle Pride and Christine Cannonier were the only individuals involved in the decisions to terminate Reid and Sears. (*Id.;* Exhibit 1 to Deposition of Ethan Horowitz, NACA Deputy General Counsel)

Horowitz verified NACA's 2-17-12 Interrogatory Answers.  At his deposition he admitted that he interviewed Bruce Marks, Don Meadows Christine Cannonier and possibly Rachelle Pride and Detria Austin, prior to preparing and verifying the 2-17-12 Interrogatory Answers.  (*Id.*, Horowitz Dep. 22-26)  Horowitz testified that at the time he prepared and verified the 2-17-12 Interrogatory Answers, based upon the interviews and certain documentary information it was his understanding that "Bruce Marks did not make the decision to terminate Kendall Reid" and "Bruce Marks did not ultimately make the decision to terminate Bradley Sears." (*Id.*)

Prior to preparing and verifying the 2-17-12 Interrogatory Answers, Horowitz specifically discussed with Bruce Marks the question of whether Marks was involved in the terminations of the Plaintiffs and concluded that Marks did not terminate Plaintiffs.[1] (*Id.*)

---

[1] The specific Horowitz testimony is:

> A.   So, Michael, during my conversation with
> Bruce Marks prior to the date or about the topic of
> this litigation prior to the date I verified Exhibit 1,
> I did discuss with Bruce any involvement that he may or
> may not have had with the termination of both Kendall

There is also a genuine issue of material fact as to the alleged reasons NACA

terminated Reid and Sears.  Marks claims that he terminated Reid because (a) Reid had

---

Reid and Bradley Sears or Bradley Sears, either one.

Q.   Was his response with respect to Mr. Sears
consistent with the response to interrogatory 13 which
does not identify Mr. Marks as being involved.

A.   Here's how I'm going to answer this question.
After reviewing the specific nonprivileged sources that
we already discussed and after my discussions with Don
Meadows, Bruce Marks and Christine Cannonier and maybe
Detria Austin and Rachelle Pride, taking all that
information, I determined that it was more likely than
not that Bruce Marks was not involved in the decision
to terminate Bradley Sears although he was more likely
than not aware of the decision to terminate Bradley
Sears.

Q.   And the same question with respect to Kendall
Reid?

A.   And I will give you the same answer.  Based
on my review of the nonprivileged materials that we
already discussed which was Reid's personnel file and
e-mails from the e-mail searches and after speaking
with Don Meadows, Christine Cannonier, Bruce Marks and
potentially Rachelle Pride and Detria Austin, the best
possible answer that I could give on behalf of the
corporation to interrogatory number 11 in Exhibit 1 was
that Bruce Marks was more likely than not involved in
the decision to terminate Kendall Reid but was more
than -- was likely aware of the decision when it was
made.

Q.   Again, just clarification, if I understand,
you came to the conclusion it was more likely than
not –
A.   That he was not involved.

Q.   But was aware?

A.   But was aware.  That's what I get for using
double negatives.  I apologize.

(Doc. 57, Pls.' 56.1 Resp. ¶33, Horowitz Dep. pg. 33-38)

18

violated NACA's paperless policy; (b) Reid had violated NACA's policies and practices

regarding submitting bank applications and paperwork to the bank and underwriting; (c) Reid

had alcohol in his office; and (d) Reid had certain attendance issues, specifically his leaving

work early on October 8.[2] (Def.'s 56.1 ¶45, Marks Dep. 86-87).  Marks claims that he

terminated Sears because (a) Sears had violated NACA's paperless policy; and (b) Marks'

belief that Sears' services to the clients was poor.[3] (Def.'s 56.1 ¶46, Marks Dep. 68, 77).

In Defendant's Second Set of Amended Answers and Objections to Plaintiff's First

Set of Interrogatories to Defendant dated July 17, 2012 ("7-17-12 Interrogatory Answers"),

NACA gave the following answer to Interrogatory No. 12:

> "12.     State fully and completely all the reasons for the termination or
> separation of employment of Kendall Reid and identify all documents which
> relate to this interrogatory and your answer thereto.
>
> RESPONSE:  NACA objects to Interrogatory No. 12 on the grounds that it is
> compound. Subject to and without waiving its objection NACA responds that
> Plaintiff Reid was terminated for attendance issues and mishandling client
> files in violation of NACA company policy."

(Doc. 57, Pls.' 56.1 Resp. ¶45, Exhibit 3 to Deposition of Ethan Horowitz)

In the 7-17-12 Interrogatory Answers, NACA gave the following answer to Interrogatory No.

14:

> "14.     State fully and completely all the reasons for the termination or
> separation of employment of Bradley Sears and identify all documents which
> relate to this interrogatory and your answer thereto.
>
> RESPONSE:  NACA objects to Interrogatory No. 14 on the grounds that it is

---

[2] Reid specifically denied committing any of the acts upon which Marks claimed as
reasons for Reid's termination.  (Doc. 57, Pls.' 56.1 SOF ¶¶2-5; Doc. 57, Pls.' 56.1 Resp.
¶45)

[3] Sears specifically denied committing any of the acts upon which Marks claimed
as reasons for Reid's termination.  (Def.'s  56.1 ¶ 32, Doc. 57, Pls.' 56.1 SOF ¶¶7,8; Doc.
57, Pls.' 56.1 Resp. ¶46)

> compound. Subject to and without waiving its objection NACA responds that Bradley Sears was terminated for attendance issues and mishandling client files in violation of NACA company policy."

(Doc. 57, Pls.' 56.1 Resp. ¶46, Exhibit 3 to Deposition of Ethan Horowitz)

NACA produced no documents which support its claim that Reid or Sears were terminated for reasons other than the reasons set forth in the 7-17-12 Interrogatory Answers. During discovery NACA did produce its response to the IDES claim for unemployment benefits of Reid which shows that the only reasons for termination where the alleged document security violation and leaving work without authorization. NACA Rule 30(b)(6) representative Cannonier admitted that the only reasons given to the Illinois Department of Employment Security for the termination of Reid were "Claimant was discharged due to policy violation, breach of confidentially, member information not protected. He also left work without authorization." (Doc. 57, Pls.' 56.1 Resp. ¶45, Doc. 57, Pls.' 56.1 SOF ¶6, Cannonier Dep. 60-62 and Exhibit 2 to Cannonier Deposition) The only document produced by NACA for Sears was its response to the IDES claim for unemployment benefits which shows that the only reason for termination was the alleged document security violation. NACA Rule 30(b) (6) representative Cannonier admitted that the only reason given to the Illinois Department of Employment Security for the termination of Sears was "Policy violation, confidentially, member information not protected." (Doc. 57, Pls.' 56.1 Resp. ¶46, Cannonier Dep. 65-66 and Exhibit 3 to Cannonier Deposition)

## SUMMARY OF APPELLANT'S ARGUMENT

The district court erred in granting Defendant-Appellee's motion for summary judgment by: erroneously concluding that Plaintiff-Appellants had failed to establish a genuine issue of material fact as to causation; failing to construe the evidence in favor of Plaintiff

Appellants and failing to draw all reasonable inferences in favor of Plaintiffs-Appellants; ignoring relevant evidence in the record; and improperly adopted defendants version of the facts.

The district court failed to construe the evidentiary admissions contained in NACA's 2-17-12 Interrogatory Answers in favor of Plaintiffs and failed to draw the reasonable inference from those evidentiary admissions that Meadows, Cannonier and Pride and not Marks made the decision to terminate Reid and Sears.

The district court also erred in failing to draw the reasonable inference that NACA's alleged reasons for terminating Reid were limited to alleged attendance issues and a violation of the NACA Document Security Policy. Similarly, the district court erred in failing to draw the reasonable inference that NACA's alleged reason for terminating Sears was limited to an alleged violation of the NACA Document Security Policy.

Marks claimed that he decided to terminate Reid because (a) Reid had violated NACA's paperless policy; (b) Reid had violated NACA's policies and practices regarding submitting bank applications and paperwork to the bank and underwriting; (c) Reid had alcohol in his office; and (d) Reid had certain attendance issues, specifically his leaving work early on October 8. (Marks Dep. 86-87). However, in NACA's 7-17-12 Interrogatory Answers, the only reasons NACA identifies for Reid's termination were alleged attendance issues and violation of the NACA document security policy. Similarly, at his deposition Marks claimed he terminated Sears because (a) Sears had violated NACA's paperless policy; and (b) Marks' belief that Sears' services to the clients was poor. (Marks Dep. 68, 77). Yet, in NACA's 7-17-12 Interrogatory Answers the only reason stated for Bradley Sears's termination was the alleged violation of NACA's document security policy. The

21

interrogatory answers are evidentiary admissions which should have been considered by the district court.  As a matter of law, these admissions   created genuine issues of material fact with respect to the reasons for NACA's termination of Plaintiffs.

The close timing of the terminations in relation to Plaintiffs' protected whistleblowing complaints supports an inference that the complaints caused the terminations and the district court's conclusion to the contrary was error.

Additionally, the "moving target" defense of NACA during the pendency of the case in and of itself created a genuine issue of fact on the question of causation i.e. retaliatory motivation. The multiple versions offered by NACA for who was involved in the termination of Plaintiffs, who made the decision to terminate and the reasons for the termination raises the reasonable inference that the real reason for the terminations was Plaintiffs' protected activities.

Because genuine issues of material fact exist, the district court committed error in granting summary judgment for NACA.

## APPELLANT'S ARGUMENT

A.     **Standard of Review**

A party is entitled to summary judgment if all of "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court construes the facts and all reasonable inferences in the light most favorable to the non-moving party when deciding a motion for summary judgment.(See *Abdullahi v. City of Madison*, 423 F. 3d 763, 773 (7th Cir. 2005)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (See *Valenti v. Qualex,*

*Inc.,* 970 F.2d 363, 365 (7th Cir. 1992), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  To withstand a motion for summary judgment, the nonmoving party must show that a dispute about a "genuine" material fact exists.  In other words, the non-movant mush offer sufficient evidence that a reasonable jury could render a verdict for the nonmoving party. (See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248)  The review of a district court ruling granting summary judgment is *de novo.* (See *Arizanovski v. Wal-Mart Stores, Inc.* 682 F.3d 698, 702 (7th Cir. 2012)).

B.     **The District Court Erred In Granting Defendant-Appellee's Motion For Summary Judgment By: Erroneously Concluding That Plaintiff-Appellants Had Failed To Establish A Genuine Issue Of Material Fact As To Causation; Failing To Construe The Evidence In Favor Of Plaintiff-Appellants And Failing To Draw All Reasonable Inferences In Favor Of Plaintiffs-Appellants; Ignoring Relevant Evidence In The Record; And Improperly Adopting Defendants Version Of The Facts.**

As the district court noted, Plaintiffs' retaliatory discharge claims are based upon complaints alleging violations of IMWL, IRMLA, and the SAFE.  Accordingly, Plaintiffs' claims fall under the "whistleblower" category of retaliatory discharge claims.  (See *Russ v. Pension Consultants Co., Inc.,* 182 Ill. App. 3d 769, 538 N.E.2d 693 (1st Dist. 1989)).  To state a claim for retaliatory discharge on a whistleblower theory, a plaintiff must allege the following: "(1) he or she was discharged; (2) in retaliation for the employee's activities; and (3) the discharge was in contravention of a clearly mandated public policy." (See *Mackie v. Vaughan Chapter-Paralyzed Veterans of Am., Inc.,* 354 Ill. App. 3d 731, 739-40, 820 N.E.2d 1042, 1049 (1st Dist. 2004)).  Applying the two step analysis of the public policy prong set forth in *Stebbings v. Univ. of Chicago,* 312 Ill. App.3d 360, 726 N.E.2d 1136, 244 Ill. Dec. 825 (1st Dist. 2000) the district court concluded that when viewed in a light most favorable to Plaintiffs, Reid and Sears satisfied the "clearly mandated" and "good faith belief"

public policy requirement with respect to their retaliatory discharge claims based upon violations of the IMWL, the IRMLA and federal SAFE statutes.  (Appendix pgs. 11-14)

While the trial court correctly concluded that Plaintiffs had satisfied the "public policy" prong of their retaliatory discharge claims, it erroneously concluded that Plaintiffs failed to establish a genuine issue of material fact as to whether their complaints were the cause of their terminations.  Moreover, the district court committed reversible error by failing to draw all reasonable inferences in favor of Plaintiffs.  The district court ignored evidence supportive of Plaintiffs claims and improperly adopted Defendants version of the facts.  The lower court did not follow well-settled summary judgment precedent.  In other words, the district court did not construes the facts and all reasonable inferences in the light most favorable to Reid and Sears.  (See *Abdullahi, supra.*)  As a result, the district court granted summary judgment against Plaintiffs and in favor of Defendant thereby committing reversible error.

To establish causation in a retaliatory discharge case under Illinois law, an employee must demonstrate that he was discharged in retaliation for protected activity. (See *Dotson v. BRP US, Inc*., 520 F.3d 703, 707 (7th Cir. 2008) (citing *Hartlein v. Illinois Power Co*., 151 Ill. 2d 142, 601 N.E.2d 720, 728, 176 Ill. Dec. 22 (Ill. 1992))  With respect to causation, "the ultimate issue to be decided is the employer's motive in discharging the employee."(See *Hartlein*, 601 N.E.2d at 730) The plaintiffs can establish causation by direct evidence or circumstantial evidence of an improper motive. (See *Jackson v. Bunge Corp*., 40 F.3d 239, 242-43 (7th Cir. 1994))

If, as in this case, the plaintiff relies on circumstantial evidence, at a minimum he must show that the decision-makers involved in his termination knew of his protected

24

activities.  (See *Burgess v. Chicago Sun-Times*, 132 Ill. App. 3d 181, 476 N.E.2d 1284, 1287, 87 Ill. Dec. 292 (Ill. App. Ct. 1st Dist. 1985))  Reid and Sears have met the foregoing burden. There is no genuine issue with respect to the decision-makers having knowledge of Reid and Sears' protected activities.  As discussed below, for summary judgment purposes, a reasonable inference should have been drawn that Meadows, Pride and Cannonier made the decision to terminate Reid and Sears.  Given that many of the Reid-Sears complaints made were directed to Don Meadows, one of the decision-makers, it cannot legitimately be argued that the persons that terminated Reid and Sears did not know of their protected activities.

   1)  **The District Court Erred In Failing To Draw The Reasonable Inference That Meadows, Cannonier And Pride And Not Marks Made The Decision To Terminate Plaintiffs.**

       The district court had an obligation to construe the facts and all reasonable inferences in the light most favorable to Reid and Sears.  (See *Abdullahi, supra.*)  Application of the foregoing summary judgment maxim required the district court to conclude that a reasonable inference existed that Meadows, Cannonier and Pride - not Bruce Marks - made the decision to terminate Plaintiffs.   In light of the evidentiary admissions in NACA's 2-17-12 Interrogatory Answers, the admissions by NACA Associate Deputy General Counsel Horowitz at his deposition and other testimonial and documentary evidence, the district court erred when it failed to rule that a genuine issue of material fact existed on the questions of who was involved in the termination and who made the decision to terminate.[4]

_____

   [4] Sears testified that Pride fired him on the spot in the Chicago office on Monday, October 11, 2010 stating: "I see you have client files on your desk. You're terminated." (Doc. 57, Pls.' 56.1 Resp. ¶¶29, 31, Sears Dep 186-187).  Cannonier testified that the decision to terminate Plaintiffs Reid and Sears was made during a conference call and that the decision was a group decision and not the decision of any one individual.  Lazu testified that Martinez told her that Martinez fired Reid.  Reid testified that Meadows and Martinez terminated him.  (Doc. 57, Pls.' 56.1 Resp. ¶33, Cannonier Dep. 50, Lazu Dep. 96, Reid Dep. 235-236).

Bruce Marks claimed at his deposition that he was the sole decision-maker in the termination of Reid and Sears. Yet, NACA's 2-17-12 Interrogatory answers state unequivocally that only Meadows, Cannonier and Pride were involved in the decision to terminate Reid and Sears. Ethan Horowitz, Associate Deputy Counsel for NACA and the verifier of the 2-17-12 Interrogatory Answers, concluded that based upon his interview with Bruce Marks and other information, Marks was not involved in the decision to terminate Reid and Sears and in particular Marks did not make the decision to termination Reid or Sears. The interrogatory answers and Horowitz testimony stand as evidentiary admissions. A reasonable inference to be drawn from these admissions is that Bruce Marks was <u>not</u> involved in, and <u>did not</u> make, the decision to terminate Reid and Sears. Another, reasonable inference to be drawn from these admissions is that Meadows, Cannonier and Pride <u>were</u> involved in, and <u>did make</u>, the decision to terminate Reid and Sears. The foregoing admissions - which directly contradict Marks' testimony - create genuine issues of material as to those involved in the termination of Reid and Sears and those who made the decision to terminate. (See *Mangual v. Prudential Lines Co,* 53 F.R.D. 301, 1971 U.S. Dist. LEXIS 11587 (E.D. Penn 1971) [interrogatory answers are evidentiary admissions and remain so even if later amended] and see *Murrey v USA,* 73 F3d, 1448 (7th Cir. 1996) [Extrajudicial admissions by a party opponent are admissible as evidence…Fed. R. Evid. 801(d)(2)…It is error to exclude such admissions]).

Surprisingly, the district court failed to construe NACA's 2-17-12 Interrogatory Answers in Plaintiff's favor and also failed to draw the foregoing obvious inferences. Instead, after it acknowledged that interrogatory answers "may constitute evidence that precludes summary judgment," it makes a series of incongruent statements. First, that district court identified the necessity "for Plaintiffs to show that the decision-makers had knowledge of Plaintiffs complaint

26

to establish a prima facie case." Second, the court stated that "such a showing may not be sufficient to establish a question of fact as to whether those complaints were the cause of Plaintiffs terminations…". The district court ended the series of statements with a quote from *Goode v. Am. Airlines, Inc.,* 741 F. Supp. 2d 877, 891 (N.D. Ill. 2010) pertaining to the elements of a prima facie case, to wit:

> "If…the plaintiff relies on circumstantial evidence, at a minimum he must show that the decision-makers involved in his termination knew that he was filing a workers' compensation claim, seeking medical treatment, or otherwise asserting a right under the IWCA." (See Appendix pg. 19)

If the district court drew the reasonable inference that Meadows, Cannonier and Pride made the decision to terminate Reid and Sears, the question of decision-maker knowledge of the complaints of Reid and Sears would be a non-issue. As previously stated, a significant portion of the complaints were actually made to Meadows who was one the decision-makers. Moreover, it is uncontroverted that Meadows, Cannonier and Pride conferenced prior to the Reid and Sears termiantions. Unfortunately, the district court did not draw the foregoing reasonable inferences and that constitutes reversible error.

**2) The District Court Erred In Failing To Draw The Reasonable Inference That NACA's Alleged Reasons For Terminating Reid Were Limited To Alleged Attendance Issues And A Violation Of The NACA Document Security Policy.**

**3) The District Court Erred In Failing To Draw The Reasonable Inference That NACA's Alleged Reason For Terminating Sears Was Limited To An Alleged Violation Of The NACA Document Security Policy.**

The district court also erred in failing to draw the reasonable inference that a genuine issue of fact existed with respect to the alleged reasons for the termination of Reid and Sears. The foregoing failure is significant to the summary judgment process. As stated in *Goode,*

*supra.* at 892, *"If the defendant provides a valid basis for the plaintiff's termination, the plaintiff may still survive summary judgment by providing evidence that the employer's explanation is mere pretext…"*

The factual contradiction between NACA's 7-17-12 Interrogatory Answers and the testimony of Bruce Marks on the alleged reasons for the termination of Reid and Sears create genuine issues of material fact. Again, rather than giving Plaintiffs the full measure of construing the admissions in Plaintiffs' favor and drawing all reasonable inferences in their favor, the district court avoided fulfilling its summary judgment obligations.

At his deposition, Marks claimed that he decided to terminate Reid because (a) Reid had violated NACA's paperless policy; (b) Reid had violated NACA's policies and practices regarding submitting bank applications and paperwork to the bank and underwriting; (c) Reid had alcohol in his office; and (d) Reid had certain attendance issues, specifically his leaving work early on October 8. (Marks Dep. 86-87). However, in answer No. 12 of NACA's 7-17-12 Interrogatory Answers, the only reasons NACA identifies for Reid's termination were alleged attendance issues and violation of the NACA document security policy. Similarly, at his deposition Marks claimed he terminated Sears because (a) Sears had violated NACA's paperless policy; and (b) Marks' belief that Sears' services to the clients was poor. (Marks Dep. 68, 77). Yet, NACA's answer to No. 14 of its 7-17-12 Interrogatory Answers states that the only reason for Bradley Sears's termination was the alleged violation of NACA's document security policy.

The foregoing interrogatory answers are evidentiary admissions by NACA. The district court should have, but did not considered the admissions. The district courts failure to give Plaintiffs the reasonable inferences to be drawn from the interrogatory answers is

28

reversible error.   As previously stated, a reasonable inference exists that Bruce Marks was not involved in the termination of Reid and Sears and that Marks did not make the decision to terminate Plaintiffs.   It follows from the foregoing inference that Marks' testimony on "his" reasons for the terminations is irrelevant for summary judgment purposes.   Conversely, the following two reasonable inferences are relevant.  First, a reasonable inference from the 7-17-12 Interrogatory Answers of NACA is that the only alleged reasons upon which NACA terminated Kendall Reid were alleged attendance issues and violation of the NACA Document Security Policy.  Second,  a reasonable inference from the 7-17-12 Interrogatory Answers of NACA is that the only alleged reasons upon which NACA terminated Bradley Sears was the alleged violation of NACA's Document Security Policy.  The district court's failure to recognize the foregoing was reversible error.  Footnote No. 5 of the Memorandum Opinion and Order provides some insight as to the potential and unnecessary harm resulting from the district court erroneous failure to construe the facts, and draw all reasonable inferences in favor of Plaintiffs.  In particular, the district court should have concluded for summary judgment purposes that: 1) Marks had nothing to do with the termination of Reid and Sears; 2) Meadows, Pride and Cannonier were the only ones involved and the only ones that made the decision to terminate; 3) the alleged reasons for Reid's termination was allegedly going to the Bulls game without permission and violation of the Document Security Policy; and 4) the alleged reason for Sear's termination was violation of the Document Security Policy.  In Footnote No. 5 the district court stated:

> Plaintiffs also raise various arguments as to why NACA's reasons for termination are pretextual…Even if the Court were to consider pretext, Plaintiffs' arguments fail because they have not demonstrated that NACA "did not honestly believe the reasons it gave for its action and is simply lying to cover [its] tracks." (*McCoy v. Maytag Corp.,* 495 F.3d 515, 522 (7th Cir. 2007)) (internal quotation marks omitted).  NACA has provided several reasons for Plaintiffs' terminations, including

for Reid that he "had alcohol in his office" and that he had "certain attendance issues, specifically his leaving work early on October 8." (Def.'s 56.1 ¶¶ 45.) Plaintiffs do not dispute that Reid left work early on October 8 at 6:30p.m. to attend a Chicago Bulls basketball game and that he had alcohol in his office, but only whether Norma Martinez authorized Reid to do so and whether such alcohol was for display purposes only. (Def.'s 56.1 ¶21; Pls.' 56.1 Resp.¶¶ 21, 28, 45.) Similarly, Defendant contends that NACA terminated Sears because Sears had violated NACA's "paperless" policy and because Marks believed that "Sears' services to the clients w[ere] poor." (Def.'s 56.1¶46.)

To be sure, the record contains the necessary facts to establish that all of the purported reasons for Reid and Sears termination are pretexual. (See footnotes 2 and 3, *supra.* and below.) However, the district court's failure to give Plaintiffs the benefit of construing the evidence and drawing all reasonable inferences in their favor caused real harm. In effect, it appears that the district court was putting Plaintiffs to the task of showing pretext for termination reasons which were literally injected into the case after the commencement of the litigation.

It is submitted that the only alleged termination reasons Reid should be tasked with providing evidence of pretext are his trip to the Bulls game on October 8, 2010 and his alleged violation of the Documents Security Policy. Similarly, for Sears, his proof of pretext should be limited to whether his printing of documents for a telephonic conference with Don Meadows violated the Document Security Policy. Evidence of pretext on the foregoing purported reasons for termination is manifest.

Plaintiffs' complaints – particularly the complaints concerning compensation splitting and signing HUD 1003 documents - presented Don Meadows with several problems. First, Reid and Sears as complainers were under his "watch" and that made him look "bad." Second, the complaints heightened the profile of the illegal activities. Third, Meadows had significant personal exposure as a result of his personal violations of the federal and state

law.  In short, Meadows had the interest and the motivation to get rid of Sears and Reid. Ostensibly, the termination of Plaintiffs would silence their complaints and lessen Don Meadows risk and exposure.  (Doc. 57, Pls.' 56.1 SOF ¶15; Reid Declaration ¶¶26-28) Indeed, Meadows admits that he spoke with both Pride, NACA National Real Estate Director and Cannonier, NACA National Human Resource Director, in a conference call prior to the terminations.  (Doc. 57, Pls.' 56.1 SOF ¶15; Meadows Dep. at 86-88)

It is submitted that a reasonable inference from the evidence in the record is that Don Meadows "set up" the Plaintiffs.  As previously stated, on October 11, 21010, Sears went to the NACA Chicago office to participate in a pre-arranged telephone conference call with Don Meadows to discuss four loan files. For the call with Meadows, Sears printed out the paperwork on the four loan files to be discussed during that days scheduled call.  There were no other paper files in his office.  After Sears printed out the paperwork for the four files he tried to make contact with Don Meadows, left him a message and awaited his return call. Meadows never returned the call.  In fact, Sears made several attempts to contact Meadows that day but Meadows never returned Sears calls even though the telephone call was pre-arranged between Meadows and Sears.  Rachelle Pride came into Sear's office while he was waiting for Don Meadows to return Sears calls and she stated: "I see you have client files on your desk, you are terminated." (Doc. 57, Pls.' 56.1 SOF ¶¶45, Declaration of Sears ¶¶5-8)

Reid testified that one week prior to the October 8, 2010 Chicago Bulls game, in front of at least six other employees in the break room, he told his supervisor Norma Martinez that he had tickets to the game and stated that if she gave him permission to go to the game he would work a 10 hour day on October 8, 2010 and also work the entire week-end.  Martinez gave her permission stating that it was fine as long as Reid was going to work the week-end.

Before Reid left for the game on October 8, 2010, Reid approached Martinez to let her know he was leaving and Martinez said, "No problem, see you tomorrow morning." Martinez never objected to Reid going to the game and never told Reid that he should not go to the game. The foregoing was corroborated by Diana Lazu. (Doc. 57, Pls.' 56.1 Resp. ¶21, Reid Dep. 146, 148-149, 173, 177, Lazu Dep. 110-112)

As previously stated, even though virtually the entire Chicago office was "in violation" of the Document Security Policy, only Reid and Sears and one other employee were terminated. (Doc. 57, Pls.' 56.1 Resp. ¶11, Cannonier Dep. 68-71 and Cannonier Dep. Exhibit 1) Moreover, Bruce Marks conceded in his deposition that violation of the document security policy would not be a basis for the termination of Reid or Sears. (Doc. 57, Pls.' 56.1 SOF ¶¶45, 46, Marks Dep. 92) The disparate enforcement of the purported Document Security Policy is further evidence that Plaintiffs' complaints, and not violation of the policy, are the real reason for their termination.

In *King v. Preferred Technical Group*, 166 F.3d 887, 894 (7th Cir. 1999) the employer told employee not to come back to work unless she could account for a missing return-to-work slip and then fired her for failing to return to work as instructed by the employer. This Court determined that a jury could disbelieve the reasons put forward by the employer, particularly if that disbelief is accompanied by a suspicion of mendacity, and that together with the elements of a *prima facie* case could show intentional discrimination, warranting a reversal of summary judgment.

The evidence in the record establishes a genuine issue of material fact on retaliatory motivation establishing the causal link between Plaintiffs complaints and their terminations. Moreover, if the relevant facts are construed in a light most favorable to Plaintiffs, it is clear

32

that the purported reasons for Plaintiffs termination were pretextual and not to be believed. The bottom line is that a reasonable inference exists that Meadows set Sears and Meadows and Martinez set up Reid.

### 4) The Timing Of The Terminations In Relation To Plaintiffs' Complaints Supports An Inference That The Complaints Caused The Terminations And The District Court's Conclusion To The Contrary Was Error.

The district court concluded that the timing of the terminations did not support an inference that Plaintiffs' complaints caused the terminations. (Appendix pg. 21-22) Contrary to the district court's ruling, the close proximity of the complaints of Reid and Sears to their firing is sufficient to create a genuine issue of fact as to causation. In the case of Sears on October 11, 2010 he complained of NACA's improper practice of splitting compensation and three days later on October 14, 2013 he was fired. In the case of Reid, his last complaints were eleven (11) days before his termination. The district court's decision on this point is in direct conflict with the holding in *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312 (7th Cir. 2011) [plaintiff fired one day after he orally complained].

In *Loudermilk, this Court held:*

Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation is sensible. See, e.g., *Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) ("very close" temporal proximity can suffice); *Casna v. Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009); *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004); *McClendon v. Indiana Sugars, Inc*., 108 F.3d 789, 796-97 (7th Cir. 1997). Deciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context, just as an evaluation of context is essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory. The district court's apparent belief that timing *never* supports an inference of causation is untenable. The closer two events are, the more likely that the first caused the second. We think that an inference of causation would be reasonable here. A jury,

33

not a judge, should decide whether the inference is appropriate.[5]

In *McClendon, supra.* the reviewing court concluded that one week was sufficient to establish the inference of causation stating :

> "Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity." [citations omitted] A close temporal connection between the two events "is generally enough to satisfy the third element of the prima facie test." [citation omitted]… We have found the causal nexus sufficiently demonstrated when the time period between the filing of a complaint and the adverse action was one day or one week. Similarly, in this case we must conclude that the sequence of events over the 2-3 day period between Mr. McClendon's filing of his complaint and his termination has established a prima facie case of retaliation. [underlining added]

It is submitted that the trial court erred in ruling that the timing evidence in this case did not support an inference of causation. On October 11, 2010, Sears complained in writing via email and electronic communication to Meadows, Stella Marquez-Murray and Detria Austin about the NACA illegal practice of splitting commissions on mortgage loan transactions. On October 14, 2010 he is fired. It simply cannot be legitimately disputed that pursuant to Loudermilk and McClendon Sears' termination came "on the heels of his protected activity." There is no question that a genuine issue of material fact on causation exists with respect to Sears making summary judgment particularly inappropriate.

Reid's last complaint to Meadows was eleven days before he was terminated. As with Sears, under existing law, a genuine issue of fact exists on causation for Reid. Can it seriously be said that a reasonable jury would not find causation when the termination was eleven days after the protected activity?

---

[5] In *Casna, supra.* the plaintiff was terminated four days after engaging in protected activity. In *Spielga, supra.* the adverse employment action came four days after the protected activity.

34

**5) The "Moving Target" Defense Of NACA During The Pendency Of The Case In And Of Itself Created A Genuine Issue Of Fact On The Question Of Retaliatory Motivation.**

It is submitted that the close proximity of Plaintiffs' protected activity to their termination alone establishes the necessary causation to survive summary judgment and the district courts ruling to the contrary was error. However, additional evidence, ignored by the district court, supports a conclusion of sufficient causation and the inference of retaliatory motive. Indeed, a reasonable jury could conclude based upon NACA's shifting defenses and the conflicting factual underpinnings that Reid and Sears were terminated because of their complaints. NACA's shifting representations as to who was involved in the decision to terminate Plaintiffs, the inconsistencies as to the alleged reasons for termination, the conflicting testimony of Bruce Marks, Ethan Horowitz, Christine Cannonier and Don Meadows are so pronounced that a reasonable jury could easily infer that NACA stories are not to be believed and the real reason Reid and Sears were fired because of their complaints. (See *Hitchcock v Angel Corps, Inc.* No. 12-3515, 2013, U.S. App. LEXIS 11761 (7th Cir. 2013))

In Hitchcock the Court concluded that the employers shifting explanations for the termination of the plaintiff were not to be believed and raised an inference of discrimination. The employer, "…by piling on additional ever-evolving justifications," could lead a juror "to wonder whether [it] can ever get its story straight." The employer's "many explanations for [the] termination were shifting, inconsistent, facially implausible, or all of the above," the court held, and, as a result, "a reasonable jury could conclude that [the] explanations were lies, and that [the employee] was fired because she was pregnant." The dictates of *Hitchcock* have direct application to the instant case. (*Id.*)

35

NACA is all over the board on: 1) who was involved in the decision to terminate Plaintiffs; 2) who made the decision to terminate plaintiffs; 3) what were the alleged reasons for terminating Plaintiffs. While Bruce Marks claims he and he alone decided to terminate Reid and Sears, the NACAs 2-17-12 Interrogatory Answers, Meadows, Pride and Cannonier were identified as the <u>only</u> individuals involved in the decisions to terminate each Plaintiff. Indeed, going into the deposition phase of discovery, the Defendant had marked out its "defense territory" and had affirmatively represented to Plaintiffs that Meadows, Pride and Cannonier were the only NACA decision-makers involved in the termination of Reid and Sears. The depositions of the Plaintiffs were then taken.[6]

Significantly, at their depositions Plaintiffs testified as to numerous complaints made to their supervisor, Norma Martinez, Don Meadows, and Detria Austin. Then, on July 17, 2012, <u>after the depositions of Plaintiffs</u>, NACA filed its 7-17-12 Interrogatory Answers which stated – for the first time in the case – that CEO, Bruce Marks was involved in the decision to terminate Kendall Reid and Bradley Sears.

Thereafter, the depositions of Marks and Horowitz were taken.[7] Incredibly, Marks testified at his deposition that he was the only one that made the decision to terminate each of the Plaintiffs and he knew nothing of their complaints. This surprising shift in the NACA defense position completely contradicted all of its earlier representations and the deposition testimony of other NACA deponents. Even more incredible, Attorney Horowitz admitted

---

[6] The deposition of Plaintiff Reid was taken on May 24, 2012 and the deposition of Plaintiff Sears was taken on May 25, 2012. Additionally, the deposition of Don Meadows was taken on May 23, 2012 and the deposition of NACA National Human Resource Director Cannonier was taken on June 8, 2012.

[7] The deposition of Bruce Marks was taken on August 16, 2012 and the deposition of Deputy General Counsel Horowitz was taken on August 16, 2012.

that after he interviewed Bruce Marks, Don Meadows, Christine Cannonier and possibly Rachelle Pride and Detria Austin, he concluded that Bruce Marks was aware of the terminations but was not involved in the decision to terminate either Reid or Sears. Horowitz Dep. pg. 24-25.  More specifically, Horowitz testified that at the time he prepared and verified the First Response interrogatories, it was his understanding that "Bruce Marks did not make the decision to terminate Kendall Reid" and "Bruce Marks did not ultimately make the decision to terminate Bradley Sears."  Horowitz Dep. pg. 24-26.  Notwithstanding the foregoing, miraculously, on July 17, 2012 Mr. Horowitz apparently concluded that Mr. Marks was involved in the decision to terminate Reid and Sears.

The reasons NACA gives for terminating Reid and Sears are also all over the board. Not only does Marks claim he and he alone terminated Plaintiff, he "gilds the lily' and adds previously undisclosed reasons for his decision to terminate.  Marks claims that he decided to terminate Reid because (a) Reid had violated NACA's paperless policy; (b) Reid had violated NACA's policies and practices regarding submitting bank applications and paperwork to the bank and underwriting; (c) Reid had alcohol in his office; and (d) Reid had certain attendance issues, specifically his leaving work early on October 8. (Marks Dep. 86-87).  However, in NACA's 7-17-12 Interrogatory Answers, the only reasons NACA identifies for Reid's termination were alleged attendance issues and violation of the Document Security Policy. Similarly, Marks claims he terminated Sears because (a) Sears had violated NACA's paperless policy; and (b) Marks' belief that Sears' services to the clients was poor. (Marks Dep. 68, 77).  Yet, NACA's 7-17-12 Interrogatory Answers states that the only reason for Bradley Sears's termination was the alleged violation of the Document Security Policy.

It is submitted that the conflicting evidence in the record, NACA shifting positions on who was involved in the Plaintiffs' termination, who decided to terminate Plaintiffs' and the reasons for the terminations, raise the inference that NACA is not to be believed and the real reasons for Reid and Sears' termination was retaliation for their protected activities.   Indeed, a reasonable conjecture may also be that an element of deliberation was in operation and once defendant locked in Plaintiffs' testimony the core defense of who decided to terminate Reid and Sears was "changed."

The "mend the hold" doctrine which has its origin in the insurance industry.  The doctrine has been referred to in the following terms:

> "Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground and put his conduct upon another and different consideration. He is not permitted thus to amend his hold. He is estopped from doing it by a settled principle of law." *Trossman v. Philipsborn*, 2006 Ill. App. LEXIS 738, No. 1-04-0588 (August 21, 2006), citing *County of Schuyler v. Missouri Bridge & Iron Co.*, 256 Ill. 348, 353, 100 N.E. 239 (1912);  see also *Gibson v. Brown*, 214 Ill. 330, 341, 73 N.E. 578 (1905); *Townsend v. Postal Benefit Ass'n of Illinois*, 262 Ill. App. 483, 489 (1931).

In the insurance industry context, courts have precluded insurers from denying a claim on one basis and then changing the basis for denial during litigation. (See e.g. *Coulter v. American Employers' Insurance Co.*, 333 Ill. App. 631, 78 N.E.2d 131 (1948)) Application of the "mend the hold" doctrine is particularly appropriate when the change in position results in surprise or prejudice.  (See *Trossman*, 2006 Ill. App. LEXIS 738, at *51) There is no question that as a result of NACA's changing defense position Plaintiffs were surprised and prejudiced.  Indeed, the motion for summary judgment is vivid proof of such prejudice.  Unfortunately, the district court did not recognize the defense tactics herein described.  This Court should not allow Defendant to "mend its hold."

## CONCLUSION

For the reasons stated above, Plaintiff-Appellants Kendall Reid and Bradley Sears pray that the Court will reverse the district court's grant of summary judgment and remand this cause for a trial by jury, for costs of the action, and for all other just and proper relief in the premises.

Dated: July 31, 2013                          Respectfully submitted,

                                              s/Michael Lee Tinaglia
                                              One of Plaintiff-Appellants Kendall Reid and
                                              Bradley Sears Attorneys

MICHAEL LEE TINAGLIA
Law Offices of Michael Lee Tinaglia, Ltd.
444 N. Northwest Highway - Suite 350
Park Ridge, Illinois 60068
Phone: (847) 692-0421; Fax: (847) 685-8440
Cook Attorney #22869; ARDC #2835886
mltinaglia@tinaglialaw.com

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

The undersigned, counsel for the Plaintiff-Appellants, Kendall Reid and Bradley Sears, furnishes the following in compliance with Fed. R. App. P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. 32(a)(7) for a brief produced with a proportionally spaced font.   The length of this brief is 11,228 words. This word count was calculated by Microsoft Word and according to the Federal Rules of Appellate Procedure 32(a)(7) does not include the Cover, Table of Contents, Table of Authorities, Signature Block, Certificate of Service and this Certificate of Compliance with F.R.A.P. 32(a)(7). This word count does include headings, footnotes, and quotations.

I affirm under the penalties for perjury that the foregoing statements are true and correct as calculated by the word count of the Microsoft Word used to prepare the petition.


Dated:   July 31, 2013


                              s/Michael Lee Tinaglia
                              Michael Lee Tinaglia

40

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

The undersigned, counsel of record for the Plaintiff-Appellants, Kendall Reid and Bradley Sears, furnishes the following in compliance with Circuit Rule 30(d):

I hereby certify that a digital version of this Brief, including the Short Appendix as required by Rule 30(a), was furnished to the Court and to each party separately represented by counsel, in PDF, at the time the paper brief was filed.

I also certify that a Short Appendix containing the Order under review is bound with Appellant's Brief.    There are no materials to be included in a separate appendix contemplated by Circuit Rule 30(b).

Dated:  July 31, 2013

<u>s/Michael Lee Tinaglia</u>
Michael Lee Tinaglia

No. 13-1768

_____

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

**KENDALL REID and BRADLEY SEARS,**
**Plaintiff-Appellants,**

**v.**

**NEIGHBORHOOD ASSISTANCE CORPORATION OF AMERICA,**
**Defendant-Appellee.**

_____

**Appeal from the United States District Court for the**
**Northern District of Illinois, Eastern Division**
**Cause No.  1:11-CV-8683**
**The Honorable Judge Amy J. St. Eve**

_____

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing Brief and Short Appendix of Appellants, Kendall Reid and Bradley Sears, has been served on the following counsel of record on July 31, 2013, by ECF filing and that a hard copy of this Appellant Brief shall be mailed within seven (7) days after notice that the Brief has been electronically filed:

Darren M. Mungerson
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1000
Chicago, Illinois 60654
dmungerson@littler.com

s/Michael Lee Tinaglia
One of Plaintiff-Appellants Kendall Reid and
Bradley Sears Attorneys

42

# APPENDIX

## Memorandum Opinion and Order
## of March 14, 2012

## A1-A24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KENDALL REID and BRADLEY SEARS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | )    No. 11 C 8683 |
| NEIGHBORHOOD ASSISTANCE | ) |
| CORPORATION OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant Neighborhood Assistance Corporation of America's

("NACA") Motion for Summary Judgment. (R. 44.) For the following reasons, the Court grants

Defendant's Motion.

## BACKGROUND

### I.    Northern District of Illinois Local Rule 56.1

Under Northern District of Illinois Local Rule 56.1 ("Local Rule 56.1"), the moving

party must file "a statement of material facts as to which the moving party contends there is no

genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). The purpose of

Local Rule 56.1 is to permit the parties to identify the relevant admissible evidence supporting

the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057,

1060 (7th Cir. 2006) (holding that a "statement of material facts did [ ] not comply with [Local]

Rule 56.1 [because] it failed to adequately cite the record and was filled with irrelevant

information, legal arguments, and conjecture"). District courts may rigorously enforce

A-1

compliance with Local Rule 56.1. *See, e.g., Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir.

2011) ("Because of the high volume of summary judgment motions and the benefits of clear

presentation of relevant evidence and law, we have repeatedly held that district judges are

entitled to insist on strict compliance with local rules designed to promote the clarity of summary

judgment filings."). With these principles in mind, the Court turns to the relevant facts.

## II.    Relevant Facts

Plaintiffs Kendall Reid and Bradley Sears were "at-will" employees of NACA. (Def.'s

56.1 Statements ¶ 20.) ("Def.'s 56.1"). NACA is a not-for-profit corporation that "counsel[s]

potential homeowners . . . to assist them in purchasing a home." (Def.'s 56.1 ¶ 2.) These

potential homeowners are also known as "members." (*Id.*) NACA's objectives are to "combat .

. . discriminatory and predatory lending practices" and to "make home ownership a realistic

possibility for thousands of people who had thought it impossible." (Def.'s 56.1 ¶ 3.) NACA

hired Reid and Sears as mortgage consultants in NACA's Chicago Office in October 2007 and

May 2010, respectively. (*Id.* at ¶¶ 15,16.) NACA's Chicago Office "consisted of an office

manager, several mortgage consultants, and two administrative assistants." (*Id.* ¶ 18.) From

early 2010 until the time of their terminations, Plaintiffs reported to Norma Martinez, the office

manager of the Chicago Office. (*Id.* ¶ 18.) Martinez reported to Donald Meadows, NACA's

Regional Operations Director for the region that included NACA's Chicago Office during 2010.

(Def.'s 56.1 ¶ 19.) Meadows was physically based in Baton Rouge, Louisiana. (*Id.*)

In April 2010, Norma Martinez placed posters on the walls of the Chicago Office

"indicat[ing] that the Illinois minimum wage was increasing to $8.25." (Pls.' 56.1 Statement of

Additional Facts ¶ 17.) ("Pl.'s 56.1 SOF") On or after July 1, 2010, at a Chicago Office staff

meeting, Reid asked Don Meadows whether NACA would pay the increased minimum wage.
(Pls.' 56.1 SOF ¶ 18.) After July 1, 2010, Reid testified that he complained to NACA
management or employees several times about the minimum wage increase. (*Id.* ¶ 18.)
Specifically, Reid contends that he complained to Don Meadows that "[NACA] did not make the
adjustments on our hourly wage." (*Id.* ¶ 19.) Sears made similar complaints to Meadows and
Martinez. (*Id.* ¶¶ 27-28.)

Reid also complained about mortgage consultants not receiving proper overtime pay.
Following the "big Chicago HomeSave" tour sometime after July 2010, Reid "raised the issue of
the wages and overtime not being right for tours with Norma [Martinez] and in one conversation
with Don Meadows." (*Id.* ¶ 21.) Specifically, Reid complained that "he and other mortgage
consultants worked 13 hour days but were not paid for working 13 hours a day." (*Id.*)

Finally, Reid complained about NACA's practices regarding the processing and splitting
of compensation for mortgage applications. As part of his work as a mortgage consultant, Reid
signed Form 1003 Applications ("Form 1003"). (*Id.* ¶ 22.) According to Plaintiffs, on a Form
1003, a mortgage consultant at NACA represents that he or she "interviewed the client applying
for the mortgage," "gathered the appropriate information to close the file," and "did not rely on
the information of others." (*Id.*) During the time when NACA was implementing federal Secure
and Fair Enforcement for Mortgage Licensing Act ("SAFE Act") regulations, Reid and
Meadows were the only two employees licensed in Illinois to sign Form 1003s. (*Id.* ¶¶ 13, 22.)
Reid averred that Meadows signed off on loan applications and documents completed by other
non-licensed mortgage consultants. (*Id.* ¶ 13.) According to Reid, he came to believe this
practice was illegal in February or March of 2010 after speaking with Hazel McLamore, a U.S.

3

A-3

Department of Housing and Urban Affairs ("HUD") representative who was auditing NACA's files. (*Id.* ¶ 23.) Ms. McLamore "confirmed that NACA practices of having licensed mortgage consultants signing off on loan files worked on by unlicensed mortgage consultants was illegal." (*Id.*) Reid complained that this practice was illegal to Norma Martinez and Don Meadows. (*Id.* ¶ 24.) Reid also complained about NACA's practice of splitting commissions between licensed and unlicensed consultants to Don Meadows and at a staff meeting. (*Id.* ¶ 25.) Reid testified that he first complained about signing documents and splitting commissions around March, April, or May of 2010, and that he made his last complaint on this subject around late September of 2010. Sears made similar complaints to NACA management regarding NACA's practices pertaining to compensation splitting and requiring "mortgage consultants to affix their names to Form 1003 Applications." (*Id.* ¶¶ 29-32. )

On Friday, October 8, 2010, Reid left the NACA office at 6:30 p.m. to attend a Chicago Bulls basketball game. (*Id.* ¶ 20; Pls.' 56.1 Resp. ¶ 21.) According to Reid, Norma Martinez gave Reid permission to do so. (Pls.' 56.1 SOF ¶ 2.) On the morning of October 9, 2010, Martinez told Reid at the Chicago Office that "he was being suspended until further notice." (Def.'s 56.1 ¶ 22.) Plaintiffs contend that Martinez told Reid that "even though he worked the ten hour day on Friday[,] it was unfair for him to leave early when everyone else had to stay to 8:00 pm." (Pls.' 56.1 Resp. ¶ 22.)

On October 11, 2010, Rachelle Pride, NACA's National Real Estate Director, visited the Chicago Office. (Def.'s 56.1 ¶ 23.) On that day, the only Chicago employees present in the office were Sears, Martinez, and Mariola Jasinska, another mortgage consultant. (Def.'s 56.1 ¶ 25.) At her deposition, Pride testified that on October 11, she informed NACA's CEO, Bruce Marks, that on her visit she saw practices that "w[ere] out of NACA policy," including "financial

4

A-4

and sensitive documents for the NACA members that were visible . . . on top of desks in

different places" and "alcoholic beverages in one of the offices." (Def.'s 56.1 ¶ 27; Pride Dep.

24:22, 28:11, 25:20.) Pride testified that she asked Marks for a directive, and he instructed her

"to ask the two mortgage consultants for their office keys and to ask them to leave the office."

(Pride Dep. 28:19-24.) Pride then explained to Sears that he "had the documents" everywhere

and that she "had been given a directive to ask him for his key and to ask him to leave the

premises." (Pride Dep. 32:17-24.) On October 14, 2010, NACA decided to terminate both Sears

and Reid. (Def.'s 56.1 ¶¶ 45-46.)

On November 2, 2011, Plaintiffs filed suit in the Circuit Court of Cook County Illinois,

alleging common law and statutory Illinois retaliatory discharge claims. (R.1, Compl.)

Plaintiffs alleged that NACA terminated them in retaliation for their complaints about NACA's

alleged failure to pay minimum wage and overtime in violation of the Illinois Minimum Wage

Law ("IMWL") and Illinois Wage Payment and Collection Act ("IWPCA"), as well as

complaints about practices regarding compensation-splitting and signing mortgage applications

allegedly prohibited by the Illinois Residential Mortgage License Act ("IRMLA") and the SAFE

Act. On December 7, 2011, Defendant removed this case to federal court on the basis of

diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (R. 1, Not. Removal.)

Defendant moved for summary judgment on September 21, 2012. (R. 44.)

## LEGAL STANDARD

Summary judgment under Rule 56(a) is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In deciding

summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving

party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380,

127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden

of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly

supported motion for summary judgment is made, the adverse party 'must set forth specific facts

showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (quotation omitted).

"[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting

evidence or make credibility determinations, both of which are the province of the jury."

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) (internal

citations omitted).

## ANALYSIS

Plaintiffs bring both Illinois common law and statutory whistleblower retaliatory

discharge claims. As the basis for their common law claims, Plaintiffs contend that they were

terminated because of their complaints regarding NACA's alleged violations of IMWL, IRMLA,

and SAFE. In addition, Plaintiffs seek statutory relief for their terminations resulting from their

complaints regarding NACA's alleged violations of the Illinois Wage Payment and Collection

Act (IWPCA), which provides a statutory retaliatory discharge cause of action.

In its Motion, Defendant argues that Plaintiffs' claims fail on two grounds. First,

Defendant contends that because Plaintiffs have failed to demonstrate that NACA's discharge of

them for their complaints would violate a clear mandate of public policy, as required for an

Illinois retaliatory discharge claim, Plaintiffs' claims are invalid. *See Turner v. Mem. Med. Ctr.*,

6

# A-6

233 Ill. 2d 294, 502, 331 Ill. Dec. 548, 557, 911 N.E.2d 369, 375 (Ill. 2009).  Second, Defendant

argues that even if Plaintiffs' terminations resulting from their complaints would violate Illinois

public policy, there are no genuine issues of material fact as to whether Plaintiffs' complaints

caused their terminations.

> The Court will address each argument in turn.

**I.  "Clear Mandate of Public Policy" Requirement for Common Law Retaliatory Discharge Claims**

> In order to determine whether Plaintiffs have satisfied this requirement, a review of the

relevant background principles governing Illinois common law retaliatory discharge claims is

necessary.  To prove an Illinois retaliatory discharge claim, the plaintiff must show: "(1) the

employment was terminated by the employer, (2) the discharge was in retaliation for action of

the employee, and (3) the discharge violates a clear mandate of public policy."  *Michael v.*

*Precision Alliance Grp., LLC*, 2011 IL App (5th) 100089, 952 N.E.2d 682, 687, 351 Ill. Dec.

890, 895 (Ill. App. Ct. 2011).  This cause of action is a narrow exception to the Illinois rule that

at-will employees "generally may be discharged for any or no reason."  *Id.*; *McGrath v. CCC*

*Info. Servs., Inc.*, 314 Ill. App. 3d 431, 438, 731 N.E.2d 384, 390 (Ill. App. Ct. 2000) (noting the

Illinois Supreme Court has "repeatedly and consistently emphasized a goal of restricting the tort

of retaliatory discharge.").  "The limited scope of retaliatory discharge is an attempt to achieve a

'proper balance' between the employer's interest in maintaining an efficient and profitable

business while recognizing the competing interests of the employee in earning a livelihood and

society's interest in effectuating vital public policies."  *Michael*, 952 N.E.2d at 686 (quoting

*Turner*, 233 Ill. 2d at 502).

Retaliatory discharge actions arise in two forms: "(1) a 'clear mandate' action, alleging that the complained-of conduct contravenes a clearly mandated public policy, but not necessarily a law; and (2) a 'citizen crime-fighter' theory." *Id.* at 687; *see Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 133, 52 Ill. Dec. 13, 421 N.E.2d 876, 880 (1981). Traditionally, "clear mandate" actions were based upon retaliation for the exercise of rights under the workers' compensation statute. *Sutherland v. Norfolk S. Ry. Co.*, 356 Ill. App. 3d 620, 624, 826 N.E.2d 1021, 1025 (Ill. App. Ct. 2005). The latter type of case "usually involve[s] an employee terminated for 'whistle-blowing' or telling of a coworker's commission of an alleged crime." *Michael*, 952 N.E.2d at 687.

Although Plaintiffs do not specifically style their retaliatory discharge claims as "whistleblower" claims, they base their claims on complaints regarding alleged violations of IMWL, IRMLA, and SAFE, rather than their exercise of any rights under these statutes. Plaintiffs' claims, therefore, fall under the "whistleblower" category of retaliatory discharge claims. *Russ v. Pension Consultants Co., Inc.*, 182 Ill. App. 3d 769, 775, 538 N.E.2d 693, 696 (Ill. App. Ct. 1989) ("The 'whistle-blowing' class of cases includes situations where an employee is dismissed for reporting that illegal or wrongful activities have been engaged in by a fellow employee or employer."); *see also King v. Senior Servs. Assocs., Inc.*, 341 Ill. App. 3d 264, 267, 792 N.E.2d 412, 415 (Ill. App. Ct. 2003) ("Retaliatory discharge actions have traditionally been allowed in two situations: (1) when an employee is discharged for seeking workers' compensation benefits; and (2) when an employee is discharged for reporting misconduct by the employer"); *Rabin v. Karlin & Fleisher, LLC*, 409 Ill. App. 3d 182, 186, 945 N.E.2d 681, 687 (Ill. App. Ct. 2011) (noting the same).

8

A-8

To state a claim for retaliatory discharge on a whistleblower theory, a plaintiff must allege the following: "(1) he or she was discharged; (2) in retaliation for the employee's activities; and (3) the discharge was in contravention of a clearly mandated public policy." *Mackie v. Vaughan Chapter-Paralyzed Veterans of Am., Inc.*, 354 Ill. App. 3d 731, 739-40, 820 N.E.2d 1042, 1049 (Ill. App. Ct. 2004). A "whistleblower" retaliatory discharge claim lies where "'an employee is discharged in retaliation for the reporting of illegal or improper conduct.'" *Lanning v. Morris Mobile Meals, Inc.*, 308 Ill. App. 3d 490, 491, 720 N.E.2d 1128, 1129 (Ill. App. Ct. 1999) (quoting *Jacobson v. Knepper & Moga, P.C.*, 185 Ill. 2d 372, 376, 235 Ill. Dec. 936, 706 N.E.2d 491, 493 (1998)). Retaliatory discharge also "protect[s] the reporting of the violation of regulations and statutes other than the Criminal Code." *Stebbings v. Univ. of Chicago*, 312 Ill. App. 3d 360, 372, 726 N.E.2d 1136, 1145 (Ill. App. Ct. 2000); *Mackie*, 354 Ill. App. 3d at 736.

With respect to the "clearly mandated public policy" prong, although "there is no precise definition" of public policy, "it can generally be said that public policy concerns what is right, just, and affects the citizenry of the State collectively." *McGrath*, 314 Ill. App. 3d at 440; *see also Belline v. K-Mart Corp.*, 940 F.2d 184, 187 (7th Cir. 1991) ("[A] matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." (quoting *Palmateer*, 52 Ill. Dec. at 15-16)). In *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 133, 52 Ill. Dec. 13, 421 N.E.2d 876, 880 (1981), the Illinois Supreme Court emphasized that there "is no public policy more basic . . . than the enforcement of a State's criminal code." 85 Ill. 2d at 130, 132. Thus, while citizens do not possess a duty to investigate and fight crime, "[Illinois] public policy nevertheless favors citizen crime-fighters." *Id.* at 132.

9

## A-9

In *Stebbings v. Univ. of Chicago*, 312 Ill. App. 3d 360 (Ill App. Ct. 2000),[1] the First

District of the Appellate Court of Illinois distinguished the public policy prong in the context of

a "citizen crime fighter" claim as a two-step analysis:

> First, there must be statutes, constitutional provisions, or judicial decisions that clearly mandate a public policy in favor of the reporting of crime. As it happens, in light of *Palmateer*, there is little question that such a policy has been clearly mandated and so this layer of law will rarely be at issue in a 'citizen crime fighter' suit. Second, there is the layer of law that allegedly prohibits the conduct that the employee reports or refuses to engage in. This layer of law must apply in that the employee must have a good-faith belief that it prohibits the conduct in question. It does not need to apply in the sense of providing a clearly mandated public policy.

> 312 Ill. App. 3d at 370-371.[2]

Before applying the *Stebbings* test to Plaintiffs' claims, the Court will address

Defendant's contention that because Plaintiffs' complaints are compensation-related and thus

purely "personal" in nature, they do not implicate the "health, safety or welfare of the citizens of

Illinois." (Def.'s Mem. 14.) In *Benders v. Bellows & Bellows*, 515 F.3d 757, 767 (7th Cir.

2008), the Seventh Circuit rejected a similar argument, noting that the violation of a federal law

governing the classification of workers as employees or independent contractors for tax purposes

involved a matter of "public concern." *See* 515 F.3d at 767. Moreover, although some of

Plaintiffs' complaints relate to compensation, because they are whistleblower claims, the

relevant public policy at issue is that identified in *Palmateer* of encouraging citizens to report

---

[1] The parties do not cite the *Stebbings* "good faith" test in their briefs. The Seventh Circuit, however, has relied upon it in interpreting Illinois retaliatory discharge claims. *See Benders v. Bellows & Bellows*, 515 F.3d 757, 766 (7th Cir. 2008); *Brandon v. Anesthesia & Pain Mgm't Assocs.*, 277 F.3d 936, 941 (7th Cir. 2002). As persuasive authority on the interpretation of Illinois law, the Court will apply it here.

[2] Although *Stebbings* arose on a motion to dismiss, and thus determined good faith on the facts as alleged, Defendant has not filed a motion to dismiss in this case.

violations of crimes and other laws. *See* 85 Ill. 2d. at 132. Thus, Defendant's argument fails.

Accordingly, the Court will consider whether Plaintiffs have satisfied the *Stebbings* formulation of the "public policy" prong for each of their common law retaliatory discharge claims.

### A.    Retaliatory Discharge Based Upon Complaints Regarding Alleged IMWL Violations

Under *Palmateer* and *Stebbings*, Plaintiffs have satisfied the "public policy" prong of their retaliatory discharge claims based upon NACA's alleged IMWL violations. First, as Plaintiffs' claims fall under the "citizen crime fighter" category, "there is little question that [a policy of reporting IMWL violations] has been clearly mandated." *Stebbings*, 312 Ill. App. 3d at 370-371. Second, Plaintiffs have satisfied the low hurdle of demonstrating a "good faith" belief that NACA's alleged conduct violated the IMWL. The IMWL provides that "on and after July 1, 2010 every employer shall pay to each of his or her employees who is 18 years of age or older in every occupation wages of not less than $8.25 per hour." ILCS 820 § 105/4. In his deposition, Reid testified that Norma Martinez posted "labor posters" in the office and break room indicating that the minimum wage would increase on July 1, 2010 to $8.25. (Reid Dep. 65:15-10.) Reid testified that he "recalled seeing" the posters and that "at the time we were getting $8 an hour." (Reid Dep. 65:19-20.) According to Reid, Andrell Thomas, another NACA employee, and "maybe one or two other people confirmed . . . that their payroll was not adjusted." (Reid Dep. 82:7-10.) Sears similarly claims that he complained to Norma Martinez and Don Meadows regarding NACA's failure to pay the new minimum wage rate. (Pls.' 56.1 SOF ¶ 27.) Thus, viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have satisfied the good-faith belief requirement with respect to their IMWL-based retaliatory

discharge claims.

### B.    Retaliatory Discharge Based Upon Alleged Violations of IRMLA

Similarly, Plaintiffs have demonstrated that their terminations for complaining about

NACA's alleged violations of IRMLA contravene a "clearly mandated" public policy.  First, as

with their IMWL-based claims, because Plaintiffs assert that Defendant terminated them for

complaining about their employer's alleged violations of law, "there is little question" that the

policy favoring reporting of such violations "has been clearly mandated." *See Stebbings*, 312 Ill.

App. 3d at 370-71.  Second, viewing the evidence in the light most favorable to Plaintiffs,

Plaintiffs have shown a good faith belief that NACA's practices violated IRMLA.[3]  IRMLA

provides that "No person, partnership, association, corporation or other entity shall engage in the

business of brokering, funding, originating, servicing or purchasing of residential mortgage loans

without first obtaining a license from the Commissioner." ILCS 205 § 635/1-3.  Plaintiffs

contend that NACA violated IRMLA and SAFE by "having licensed mortgage consultants sign[]

off on loan files worked on by unlicensed mortgage consultants." (Pls.' 56.1 SOF ¶ 3.)  Reid

allegedly came to believe this practice was illegal after speaking with Hazel McLamore, a HUD

---

[3] Although Defendant argues in its Rule 56.1 statements with respect to these allegations
that NACA need not respond to legal conclusions, Plaintiffs need only demonstrate at this stage
that they had a good faith belief that the conduct was illegal. *See Brandon*, 277 F.3d at 941
("The [Illinois retaliatory discharge] tort also does not require the employee to have been correct
about the unlawfulness of the conduct, as long as she had a good-faith belief that it was
unlawful."); *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) ("The fact that Bourbon
may have been wrong about whether the conduct was criminal is irrelevant under Illinois law.
The Illinois Supreme Court explained that persons acting in good faith who have probable cause
to believe crimes have been committed should not be deterred from reporting them by the fear of
being wrongfully discharged." (internal citations omitted)).

# A-12

employee who was auditing NACA's files. (Pls.' 56.1 SOF ¶ 23.)[4]  Accordingly, viewing this

evidence in the light most favorable to Plaintiffs, Plaintiffs have satisfied the "public policy"

requirement for their whistleblower retaliatory discharge claims based upon complaints

regarding alleged violations of IRMLA.

      **C.     Retaliatory Discharge Based Upon Alleged Violations of SAFE**

      The SAFE Act encourages the States "to establish a Nationwide Mortgage Licensing

System and Registry for the residential mortgage industry." *See* 12 U.S.C. § 5101.  It provides

that subject to a mortgage licensing system, "an individual may not engage in the business of a

loan originator without first--(1) obtaining, and maintaining annually--(A) a registration as a

registered loan originator; or (B) a license and registration as a State-licensed loan originator."

*See* 12 U.S.C. § 5103.  Though Defendant argues in its brief that it is not clear that an alleged

violation of a federal law may give rise to an Illinois retaliatory discharge whistleblower claim

(Def.'s Reply 13 n.8), the Seventh Circuit has foreclosed this argument.  *See Brandon*, 277 F.3d

at 941 ("Notwithstanding the fact that Illinois has long had a public policy that encourages

citizens to report crimes, the district court took the rather narrow view that these federal criminal

statutes could not provide a basis for Illinois public policy." (internal citations omitted)).

      Because Illinois enacted IRMLA to comply with the federal SAFE Act, *see* ILCS 205 §

635/1-2, the same analysis regarding Plaintiffs' IRMLA retaliatory discharge claims applies to

Plaintiffs' retaliatory discharge claims premised upon violations of SAFE.  Moreover, any

differences in the legislation are insubstantial at this stage, as the *Stebbings* analysis does not

---

    [4] Similarly, Sears' allegations of his complaints, which are substantially the same as
Reid's, provide evidence of his good faith belief that NACA violated IRMLA, IMWL, and
SAFE. (Pls.' SOF ¶¶ 27-32.)

13

# A-13

"require the employee to have been correct about the unlawfulness of the conduct, as long as she had a good-faith belief that it was unlawful." *See Brandon*, 277 F.3d at 941. Thus, for the same reasons, Plaintiffs' SAFE-based retaliatory discharge claims satisfy the "public policy" requirement at this stage.

## II.    Illinois Statutory IWPCA Retaliatory Discharge Claim

In addition to common law retaliatory discharge claims, Plaintiffs raise a statutory retaliatory discharge claim premised upon complaints regarding alleged violations of the IWPCA.

The IWPCA defines wages as "including any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2. It does not, however, "establish a right to overtime pay or vacation pay, but rather allows for a cause of action based on compensation wrongfully withheld pursuant to 'an employment contract or agreement.'" *Hall v. Sterling Park Dist.*, 08 C 50116, 2011 WL 1748710, at *6 (N.D. Ill. May 4, 2011) (quoting 820 ILCS 115/1); *Palmer v. Great Dane Trailers*, 05 C 1410, 2005 WL 1528255, at *3 (N.D. Ill. June 28, 2005) ("The plain meaning of the IWPCA indicates that pay is only recoverable under the statute when the employer has breached contractual obligations."). As the Seventh Circuit has noted, Illinois courts have interpreted an "agreement" under the IWPCA to be "broader than a contract and require[] only a manifestation of mutual assent on the part of two or more persons . . . without the formalities and accompanying legal protections of a contract." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (quoting *Zabinsky v. Gelber Grp., Inc.*, 347 Ill. App. 3d 243, 249, 807 N.E.2d 666, 671 (Ill. App.

Ct. 2004)).

Specifically, Plaintiffs seek relief under Section 14(c) of the IWPCA, which the Illinois

legislature amended in 2011 to include a cause of action for retaliation.  (Compl. ¶ 15.) (R. 58,

Pls.' Mem. 14).  Effective January 1, 2011, Section 14(c) provides the following:

> Any employer, or any agent of an employer, who discharges or in any other manner
> discriminates against any employee because that employee has made a complaint to his
> employer . . . that he or she has not been paid in accordance with the provisions of this
> Act . . . is guilty, upon conviction, of a Class C misdemeanor.  An employee who has
> been unlawfully retaliated against shall be entitled to recover through a claim filed with
> the Department of Labor or in a civil action, but not both, all legal and equitable relief as
> may be appropriate.  In a civil action, such employee shall also recover costs and all
> reasonable attorney's fees.

820 ILCS 115/14 (amended by P.A. 96-1407 (S.B. 3568)).

In their Response, Plaintiffs do not direct the Court to any cases interpreting the new

IWPCA retaliation provision.  Nor did the Court's independent research reveal any such cases.

Ultimately, however, Plaintiffs' statutory IWPCA retaliatory discharge claims cannot survive

summary judgment because the record does not reflect any evidence that NACA failed to pay

Plaintiffs "in accordance with the provisions of [the IWPCA]."  *See* 820 ILCS 115/14.

Specifically, case law interpreting claims to recover wages under the IWPCA makes clear that

the wages must have arisen from a contract or agreement.  *See Hess*, 668 F.3d at 452 ("To

prevail on his IWPCA claim, Hess must first show that he had a valid contract or employment

agreement."); *Lopez v. Smurfit-Stone Container Corp.*, 02 C 7347, 2003 WL 297533, at *3 (N.D.

Ill. Feb. 10, 2003) (noting any entitlement to overtime wages arose from a collective bargaining

agreement and not the IWPCA).

In arguing that NACA terminated them because of their complaints about not receiving

proper overtime, (Pls.' Mem. 5), Plaintiffs have failed to direct the Court to any evidence

showing that such overtime pay was allegedly owed pursuant to a contract or agreement.
Although Reid stated in his deposition that he believed he had an "employment contract" with
NACA, he also subsequently acknowledged that he did not believe that either NACA's
"welcome letter" or personnel manual, which describe compensation, constituted an employment
contract. (Def.'s 56.1, Ex. 4, Reid Dep. 53:1-3.) Furthermore, Reid acknowledged in his
deposition that he signed the NACA personnel manual, which stated that the manual "did not
create a contract of employment" and that his "employment with NACA is on an at-will basis."
(Def.'s 56.1, Ex. 4, Reid Dep. 54: 16-22, Ex. 3); *see Skelton v. Am. Intercontinental Univ.
Online*, 382 F. Supp. 2d 1068, 1075 (N.D. Ill. 2005) (noting a similar disclaimer "[was] fatal to
plaintiffs' claim that the handbook was a 'contract' to pay overtime wages within the meaning of
the IWPCA"). Nor have Plaintiffs directed the Court to any evidence showing that the overtime
arose from a broader "agreement" or "manifestation of mutual assent." Accordingly, because
Plaintiffs have failed to present any evidence that the complaints related to overtime allegedly
owed to them pursuant to a contract or agreement, the Court dismisses Plaintiffs' retaliatory
discharge claims based upon a violation of the IWPCA.

III.    **Causation**

        Here, the parties dispute whether genuine issues of material fact exist as to whether
Plaintiffs' complaints regarding NACA's alleged violations of IMWL, IRMLA, and SAFE
caused NACA's termination of Plaintiffs. Defendant argues that Plaintiffs have failed to put
forth any evidence demonstrating that the sole decision maker, Bruce Marks, according to
Defendant, knew of Plaintiffs' complaints. Because after a "properly supported motion for
summary judgment is made, the adverse party 'must set forth specific facts showing that there is
a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (quotation omitted), Plaintiffs must

present evidence showing a genuine issue of fact exists as to causation.

In response, Plaintiffs contend that genuine issues of material fact exist as to (1) whether Bruce Marks was the sole decisionmaker in the terminations based upon NACA's inconsistent interrogatory answers regarding the individuals involved in the decision to terminate Plaintiffs; and (2) whether Don Meadows had retaliatory animus toward Plaintiffs based upon his alleged involvement in illegal practices about which Plaintiffs complained and whether such animus caused the termination decisions. (Pls.' Mem. 6-8.)

To establish causation in an Illinois retaliatory discharge claim, the plaintiff must prove that the employer discharged him "in retaliation for the employee's activities." *Mackie*, 354 Ill. App. 3d at 739-40. "[T]he ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Ill. Power Co.*, 151 Ill. 2d 142, 163, 176 Ill. Dec. 22, 601 N.E.2d 720 (1992). Plaintiffs may establish causation through direct or circumstantial evidence. *Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 569, 900 N.E.2d 353, 360 (Ill. App. Ct. 2008) (citing *Hugo v. Tomaszewski*, 155 Ill. App. 3d 906, 910, 108 Ill. Dec. 562, 508 N.E.2d 1139 (Ill. App. Ct. 1987)); *Goode v. Am. Airlines, Inc.*, 741 F. Supp. 2d 877, 891 (N.D. Ill. 2010) (analyzing Illinois retaliatory discharge claim). Nonetheless, "it remains plaintiff's burden to prove the elements of the cause of action" in a retaliatory discharge case, including causation. *Clemons v. Mech. Devices Co.*, 184 Ill. 2d 328, 336, 704 N.E.2d 403, 406 (1998). Thus, "an employer is not required to come forward with an explanation for an employee's discharge." *Clemons*, 184 Ill. 2d at 336. "[I]f an employer chooses to come forward with a valid, nonpretextual basis for discharging its employees and the trier of fact believes it, the causation element required to be proven is not met." *Id.*; *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 301 (7th Cir. 2010) (applying *Clemons* approach on summary judgment); *Siekierka v. United Steel*

17

A-17

*Deck, Inc.*, 373 Ill. App. 3d 214, 222, 868 N.E.2d 374, 380 (Ill. App. Ct. 2007).

In *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 301 (7th Cir. 2010), the Seventh Circuit

held that in deciding motions for summary judgment on Illinois retaliatory discharge claims, the

*Erie* doctrine requires federal courts to follow Illinois law rather than the federal *McDonnell*

*Douglas* burden-shifting approach in determining whether a plaintiff has met his burden on

causation. *See* 614 F.3d at 303. In explaining the difference between the rules, the Seventh

Circuit noted that in a case governed by *McDonnell Douglas*, "if the employer fails to offer any

reason for having fired the plaintiff," "[a]n inference would arise that the reason was the

unlawful one alleged by the plaintiff" and "the plaintiff would win under *McDonnell Douglas*

without more." *Gacek*, 614 F.3d at 301. On the other hand, under the Illinois rule, "which

requires proof of causation," the plaintiff, as in a traditional tort claim, "would have to prove that

the alleged discrimination was the cause of his being fired." *Id.* Accordingly, a plaintiff may not

survive summary judgment merely by "proving that the reasons given . . . for firing him were

unworthy of belief." *Id.* at 303; *Robinson v. Stanley*, 06 C 5158, 2011 WL 3876903, at *6 (N.D.

Ill. Aug. 31, 2011) *aff'd*, 474 F. App'x 456 (7th Cir. 2012).

### A. NACA's Interrogatory Answers Regarding Individuals Involved in Terminations

In NACA's February 17, 2012 interrogatory answers, NACA listed Don Meadows,

Rachelle Pride, and Christine Cannonier in response to a question regarding the individuals

involved in the decision to terminate Plaintiffs. (Pls.' 56.1 SOF ¶ 35.) In its July 17, 2012

amended response to Plaintiffs' interrogatories, NACA added the name of Bruce Marks to this

list. Later, Marks testified in his deposition that it was solely his decision to terminate Plaintiffs

and that he did not know of their complaints when he decided to terminate them. (Def.'s 56.1,

Ex. 3, Marks Dep. Tr. 36:5:11.) Marks also acknowledged that he received input on the decision

from Rachelle Pride, Don Meadows, Christine Cannonier, NACA's National Human Resources

Director, and James Kimmons, a NACA employee who worked in the Milwaukee, Wisconsin

Office, and that he had a conversation with Meadows regarding Sears and Reid prior to their

terminations. (Def.'s 56.1 ¶ 42.)

Plaintiffs argue that the inconsistent interrogatory answers constitute evidentiary

admissions and create a genuine issue of material fact as to who terminated Plaintiffs'

employment. (Pls.' Mem. 6.) Interrogatory answers may constitute evidence that precludes

summary judgment. *See Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 679 (7th

Cir. 2003). In a retaliatory discharge case based on an employee's complaints, evidence that

those responsible for the employee's termination knew of his complaints is "essential." *See

Hunt v. DaVita, Inc.*, 680 F.3d 775, 779 (7th Cir. 2012) ("[L]ogic dictates that any inference of

retaliatory intent must be based on the alleged retaliator's knowledge of the action allegedly

retaliated for.") Plaintiffs' argument, however, fails to acknowledge that while it may be

necessary for Plaintiffs to show that the decisionmakers had knowledge of their complaints to

establish a prima facie case, such a showing may not be sufficient to establish a question of fact

as to whether those complaints were the cause of Plaintiffs' terminations under the heightened

Illinois standard. *See Goode*, 741 F. Supp. 2d at 891 ("If . . . the plaintiff relies on circumstantial

evidence, at a minimum he must show that the decision-makers involved in his termination knew

that he was filing a workers' compensation claim, seeking medical treatment, or otherwise

asserting a right under the IWCA.") Thus, even viewing the facts in the light most favorable to

Plaintiffs, the Court must address whether Plaintiffs have offered further evidence of causation.

A-19

## B.    "Cat's Paw" Theory

Plaintiffs argue that even assuming that Marks was the "ultimate decision maker," causation is satisfied under a "cat's paw" theory, by which NACA would be liable for the terminations notwithstanding Marks' lack of knowledge of Plaintiffs' complaints because "Meadows, while acting within the scope of his employment caused Marks to terminate Reid and Sears by lying to Marks." (Pls.' Mem. 8.)  Specifically, Plaintiffs assert that "Meadows had an interest" in the termination of Plaintiffs because Meadows had "significant personal exposure as a result of him personally violating . . . federal and state law" and because the "termination of [the Plaintiffs] would silence . . . complaints and lessen Don Meadows' risk and exposure arising from the federal and state law violations." (Pls.' 56.1 SOF ¶ 15; Reid Decl. ¶¶ 26-28.)  In support of their theory, Plaintiffs point to Reid's testimony regarding his own concerns about the legality and consequences of NACA's practices. *See* Pls.' SOF ¶ 25.  This speculation is insufficient to create a genuine issue of material fact as to whether Meadows had any retaliatory animus based upon Plaintiffs' complaints or whether any such animus caused their terminations. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").  Plaintiffs further point to a conversation between Marks and Meadows, in which Meadows told Marks that Plaintiffs had been warned about the document security policy by James Kimmons on one of Kimmons' visits to the Chicago Office.  Plaintiffs contend that a genuine issue of fact exists as to whether Kimmons discussed the document security policy with the employees and Reid specifically on that visit, (Pls.' Mem. 8), and that any such discrepancy supports an inference both that Meadows lied to Marks and that Meadows had retaliatory animus toward Plaintiffs. (Pls.' Mem. 8.)

20

A-20

Even viewing the inferences in the light most favorable to Plaintiffs, Plaintiffs' "cat's paw" theory fails. As an initial matter, Plaintiffs fail to cite to any cases applying the "cat's paw" theory in the context of Illinois retaliatory discharge claims. Plaintiffs also fail to provide any evidence connecting Meadows' rather vague statement to Marks–that Plaintiffs had been "warned" about the "paperless policy" and that "yeah James [Kimmons] was [at the Chicago Office] previously and we just had this conversation within a two-week period"– to any retaliatory motive to terminate Plaintiffs because of Meadows' own alleged participation in illegal practices. (Pls.' Resp., Meadows Dep. 106.) Nor does the record show any evidence demonstrating that any other individuals potentially involved in Plaintiffs' terminations had retaliatory animus toward Plaintiffs. Thus, Plaintiffs' cat's paw theory is unavailing.

**C.    Timing**

Furthermore, the timing of the terminations does not support an inference that Plaintiffs' complaints caused their terminations. *Davis v. Times Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 496, 697 N.E.2d 380, 387 (Ill. App. Ct. 1998) ("[T]he timing of the termination, by itself, is not enough to show retaliatory discharge."); *Zuccolo*, 387 Ill. App. 3d at 569 (noting in denying summary judgment not only the "short span of time" between the plaintiff's complaints to his employer and his termination, but his intended refusal to pilot a certain vessel and complaints to the Coast Guard); *see also Teruggi v. CIT Group/Capital Fin., Inc.*, 12-2314, 2013 WL 628324, at *6 (7th Cir. Feb. 21, 2013) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." (quoting *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004))). Although Plaintiffs argue that Plaintiffs complained as recently as several weeks and days, respectively, before their terminations, (*see* Pls.' SOF ¶

21

A-21

26, 32; Lazu Dep. 56), the record demonstrates that most of the complaints regarding minimum

wage and overtime came in June and July of 2010, and those concerning NACA's practices with

respect to splitting commissions and signing Form 1003s from March until June of 2010—months

before NACA's decision to terminate Plaintiffs in October 2010. *See* Pls.' SOF ¶¶ 17-21, 24, 25,

30. Moreover, both Reid and Diane Lazu, a NACA employee who testified to Plaintiffs'

complaints, describe the complaints as an "ongoing" concern, which further undermines the

significance of the short period of time between the last set of complaints and Plaintiffs'

terminations. (Pls.' 56.1 Resp., Lazu Dep. 40, 43, 49; Reid Dep. 245.); *see Goode*, 741 F. Supp.

2d at 893 (noting "suspicious timing" where firing occurred a month from injury for which

employee sought worker's compensation and employer began investigating employees's

activities within a day of injury). In sum, the timing of Plaintiffs' terminations alone does not

support an inference that Plaintiffs' complaints caused them.[5]

---

[5] Plaintiffs also raise various arguments as to why NACA's reasons for termination are
pretextual. (Pls.' Mem. 10.) The Seventh Circuit has made clear, however, that under the
stricter Illinois causation standard, a plaintiff may not prevail "merely by proving that the
reasons given by the [employer] for firing [the employee] were unworthy of belief." *Gacek*, 614
F.3d at 303. Even if the Court were to consider pretext, Plaintiffs' arguments fail because they
have not demonstrated that NACA "did not honestly believe the reasons it gave for its action and
is simply lying to cover [its] tracks." *McCoy v. Maytag Corp.*, 495 F.3d 515, 522 (7th Cir. 2007)
(internal quotation marks omitted). NACA has provided several reasons for Plaintiffs'
terminations, including for Reid that he "had alcohol in his office" and that he had "certain
attendance issues, specifically his leaving work early on October 8." (Def.'s 56.1 ¶ 45.)
Plaintiffs do not dispute that Reid left work early on October 8 at 6:30 p.m. to attend a Chicago
Bulls basketball game and that he had alcohol in his office, but only whether Norma Martinez
authorized Reid to do so and whether such alcohol was for display purposes only. (Def.'s 56.1 ¶
21; Pls.' 56.1 Resp. ¶¶ 21, 28, 45.) Similarly, Defendant contends that NACA terminated Sears
because Sears had violated NACA's "paperless" policy and because Marks believed that "Sears'
services to the clients w[ere] poor." (Def.'s 56.1 ¶ 46.) Plaintiffs admit that NACA had a
written policy entitled "NACA Office Document Security Policy," which provided that "under
[no] circumstances should a member's personal information be left exposed in your work area"
(Pls.' 56.1 Resp. ¶ 5; Pls.' 56.1 SOF ¶ 11; Def.'s 56.1, Ex. 4, Reid Dep., Ex. 13.), and that Sears
"print[ed] off members' documents in anticipation of a meeting with management." (Pls.' Resp.

Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs have not shown a genuine issue of material fact as to whether Plaintiffs' complaints were the cause of their terminations under the more rigorous Illinois rule. *See Gacek*, 614 F.3d at 303 (noting the *McDonnell Douglas* and Illinois rules are "materially different"). In light of the gap in time between the majority of the complaints and the terminations and the lack of evidence supporting Plaintiffs' retaliatory animus "cat's paw" theory, Plaintiffs at best raise only a "metaphysical doubt" rather than a genuine issue of material fact as to the cause of their terminations. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Defendant, therefore, is entitled to summary judgment on Plaintiffs' claims.

---

56.1 ¶¶ 31, 32.) Moreover, while Plaintiffs argue that NACA did not terminate every mortgage consultant who allegedly violated the "paperless" policy, NACA did terminate Mariola Jasinska–the only other mortgage consultant besides Sears present in the office on the day of Pride's visit to the Chicago Office–when she observed conduct that was "outside" the NACA policy. (*See* Pls.' 56.1 Resp. ¶¶ 24, 49.) Ultimately, these discrepancies show a difference in interpretation between Plaintiffs and NACA over NACA's policies rather than a dispute as to whether decisionmakers at NACA honestly believed that they were applying those policies at the time. *See Teruggi*, 2013 WL 628324, at *5 ("An unwise employment decision does not automatically rise to the level of pretext; rather, a party establishes pretext with evidence that the employer's stated reason or the employment decision was a lie—not just an error, oddity, or oversight." (internal quotation marks omitted)); *Goode*, 741 F. Supp. at 894.

## CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment.

**Date: March 14, 2013**

ENTERED

_AMY J. STUEVE_
**United States District Court Judge**

# A-24

# APPENDIX

## Exhibit 29 to Meadows Deposition

## A25-A28

Page 1 of 1

(no subject)  NACA  X

<span style="float:right">hide details 1</span>

from   Bradley Sears BSears@naca.com
to   bsears900@gmail.com
date   Mon, Oct 11, 2010 at 4:25 PM
mailed-by  naca.com

What is this e-mail from Detria about ?

"Current MC to receive 75% of file. It was over 3 months since last MC worked and current MC updated and c

My contract and my joining NACA – with my license in tact – was for 100% of my commissions.  There were
of less than 100 % from Detria, you or my boss, Norma ......  No one ever mentioned this.

What does this comment about 3 months mean?  I have no idea what this references.
Please confirm my commissions at 100% ASAP.

Sincerely,

Bradley

(4:51 PM) Bradley Sears: And for Christina Jones 984959 -
(4:51 PM) Bradley Sears: Current MC to receive 50% NRCP. File was already qualified before transition.
(4:52 PM) Bradley Sears: Then this ? Current MC to receive 50% NRCP. File was already qualified before tra
Samatha Arroyo, I missed this last e-mail.
(4:56 PM) Donald Meadows: Who closed the file? The commission is split was for your benefit due the fact yo
the time we the loan applications were taken we decided to provide a split of commission so you can still ben
members qualified. The split is normally 80/20 so the question becomes did you qualify this member?
(5:19 PM) Bradley Sears: The question is not and never was, who qualified the file.
          When you hired me, you never said that my commission depended on who qualified th
they were still at NACA or not.    Samantha sign the application because the original Licensing guy for NAC
license to transfer to NACA.  He dropped the ball. I have always had my license,          You ne
commission was affected by another set of hands working on the file before me. In fact, you did say that you I
were already ready to close that would boost my income.  You never said that those file had a different pay st

Bradley Sears
NACA
Mortgage Consultant
4425 W. 63rd Street
Chicago, IL 60629
Bsears@naca.com
Neighborhood Assistance Corporation of America   www.naca.com
773-723-6222,  x 1411
888-302-NACA (6222)



A-25

Sears00182

Pay Changes

(4:56 PM) Donald Meadows: Who closed the file? The commission is split was for your benefit due the fact you had no license at the time we the loan applications were taken we decided to provide a split of commission so you can still benefit from getting the members qualified. The split is normally 80/20 so the question becomes did you qualify this member?

(5:19 PM) Bradley Sears: The question is not and never was, who qualified the file.                              When you hired me, you never said that my commission depended on who qualified the file - and whether they were still at NACA or not.      Samantha sign the application because the original Licensing guy for NACA forgot to sent in my license to transfer to NACA.  He dropped the ball.  I have always had my license.              You never said to me that my commission was affected by another set of hands working on the file before me. In fact, you did say that you had files for me that were already ready to close that would boost my income.  You never said that those file had a different pay structure.

What is this e-mail from Detria about ?

"Current MC to receive 75% of file. It was over 3 months since last MC worked and current MC updated and closed".

My contract and my joining NACA – with my license in tact  - was  for 100% of my commissions.
There were never any discussions of less than 100 % from Detria, you or my boss, Norma ........ No one ever mentioned this.
What does this comment about 3 months mean?  I have no idea what this references. Please confirm my commissions at 100% ASAP.
Sincerely,
Bradley

A-26

Sears00183

Page 1 of 2

**FW: NRCP Split: Christina J Jones - 984959**  NACA  X

from    Bradley Sears BSears@naca.com            hide details ↑
to      bsears900@gmail.com
date    Mon, Oct 11, 2010 at 3:54 PM
subject   FW: NRCP Split: Christina J Jones - 984959
mailed-by   naca.com

Bradley Sears
NACA
Mortgage Consultant
4425 W. 63rd Street
Chicago, IL 60629
Bsears@naca.com
Neighborhood Assistance Corporation of America    www.naca.com
773-723-6222, x 1411
888-302-NACA (6222)

**From:** daustin@naca.com [mailto:daustin@naca.com]
**Sent:** Monday, October 11, 2010 2:31 PM
**To:** Stella Marquez-Murray; Bradley Sears
**Cc:** Detria L. Austin; Detria L. Austin
**Subject:** NRCP Split: Christina J Jones - 984959

Current MC to receive 50% NRCP. File was already qualified before transition.

Reply     Forward

Bradley Sears to me                    show details ↑

Bradley Sears
NACA
Mortgage Consultant
4425 W. 63rd Street
Chicago, IL 60629
Bsears@naca.com
Neighborhood Assistance Corporation of America    www.naca.com
773-723-6222, x 1411
888-302-NACA (6222)

**From:** daustin@naca.com [mailto:daustin@naca.com]
**Sent:** Monday, October 11, 2010 2:32 PM
**To:** Samantha Arroyo; Bradley Sears; Stella Marquez-Murray

**Cc:** Detria L. Austin; Detria L. Austin
**Subject:** NRCP Split: Christina J Jones - 984959

# A-27

Page 2 of 2

Current MC to receive 50% NRCP. File was already qualified before transition. 50% NRCP to Sama missed this last e-mail.

A-28